GEORGE H. DAVIS & others *vs.* OLD COLONY RAILROAD
                          COMPANY.

Suffolk.  Nov. 12, 13, 1879. — June 28, 1881.  MORTON, FIELD & DEVENS,
                          JJ., absent.

SAME *vs.* SMITH AMERICAN ORGAN COMPANY.

Suffolk.  Jan. 13, 14. — June 28, 1881.  COLT, FIELD & DEVENS, JJ., absent.

It is beyond the powers of a railroad corporation chartered by the Legislature, or
    of a corporation organized under the St. of 1870, c. 224, for the manufacture
    and sale of musical instruments, to guarantee the payment of expenses of a
    musical festival; and no action can be maintained against either corporation
    upon such a guaranty, although it was made with the reasonable belief that
    the holding of the proposed festival would be of great pecuniary benefit to the
    corporation by increasing its proper business, and the festival has been held
    and expenses incurred in reliance upon the guaranty.

GRAY, C. J.   These actions are brought upon an agreement,
signed by the Old Colony Railroad Company in the sum of
$6000, and by the Smith American Organ Company in the sum
of $5000, and by other corporations, partnerships and individu-
als in various sums, amounting in all to more than $200,000.

The agreement is in these words: " Boston, January 23, 1872.
We the undersigned subscribers hereby agree, each with the
other, that we will contribute towards any deficiency (should
there be one) that may arise towards defraying the expenses of
the World's Peace Jubilee and International Musical Festival,
to be held in Boston, commencing on the 17th of June and
closing on the 4th of July next, in such proportions as the
amounts affixed to our several names bear to the whole amount
subscribed: provided that no subscription shall be binding until
the whole amount subscribed shall reach the sum of two hun-
dred thousand dollars, and that no expenditure be incurred ex-
cept under the authority of the executive committee, which
committee shall represent the subscribers, and consist of ten or
more persons, who may be chosen by the first six subscribers
hereto."

At the trial of the first action, the plaintiffs offered to prove
that the signature of each corporation was made by authority of
its directors, with the reasonable belief that the holding of the

festival proposed would be of great pecuniary benefit to the corporation by increasing its proper business, and that the signature would promote such holding; that the festival was held as mentioned in the agreement of guaranty; and that the reasonable expenditures therefor, made under authority of the plaintiffs, who relied upon that agreement in making them, exceeded the receipts by more than $200,000.

The only point argued and decided when one of these cases was before us upon demurrer to the declaration was, that the promise of the subscribers was to the executive committee therein mentioned, and that these plaintiffs as such committee were the proper parties to sue thereon. *Davis* v. *Smith American Organ Co.* 117 Mass. 456.

The principal question now presented by the answer, and which lies at the threshold of each case, is whether it was within the power of the defendant corporation to bind itself by such an agreement. Upon full consideration of the elaborate arguments of counsel upon that question, the court is of opinion that the agreement is *ultra vires*, and therefore no action can be maintained upon it against either defendant.

The reported cases on the subject are so numerous, that we shall refer to comparatively few of them, except the principal cases in England and the decisions of the Supreme Court of the United States and of this court.

A corporation has power to do such business only as it is authorized by its act of incorporation to do, and no other. It is not held out by the government, nor by the stockholders, as authorized to make contracts which are beyond the purposes and scope of its charter. It is not vested with all the capacities of a natural person, or of an ordinary partnership, but with such only as its charter confers. If it exceeds its chartered powers, not only may the government take away its charter, but those who have subscribed to its stock may avoid any contract made by the corporation in clear excess of its powers. If it makes a contract manifestly beyond the powers conferred by its charter, and therefore unlawful, a court of chancery, on the application of a stockholder, will restrain the corporation from carrying out the contract; and a court of common law will sustain no action on the contract against the corporation.

Every person who enters into a contract with a corporation is bound at his peril to take notice of the legal limits of its capacity, especially where, as in this Commonwealth, all acts of incorporation are deemed public acts, and every corporation organized under general laws is required to file in the office of the Secretary of the Commonwealth a certificate showing the purpose for which the corporation is constituted. Gen. Sts. *c.* 3, § 5. St. 1870, *c.* 224, §§ 7, 11. *Whittenton Mills* v. *Upton*, 10 Gray, 582, 598. *Richardson* v. *Sibley*, 11 Allen, 65, 72. *Pearce* v. *Madison & Indianapolis Railroad*, 21 How. 441, 443. *East Anglian Railways* v. *Eastern Counties Railway*, 11 C. B. 775, 811. *Ashbury Railway Carriage & Iron Co.* v. *Riche*, L. R. 7 H. L. 653.

There is a clear distinction, as was pointed out by Mr. Justice Campbell in *Zabriskie* v. *Cleveland, Columbus & Cincinnati Railroad*, 23 How. 381, 398, by Mr. Justice Hoar in *Monument Bank* v. *Globe Works*, 101 Mass. 57, 58, and by Lord Chancellor Cairns and Lord Hatherley in *Ashbury Railway Carriage & Iron Co.* v. *Riche*, L. R. 7 H. L. 668, 684, between the exercise by a corporation of a power not conferred upon it, varying from the objects of its creation as declared in the law of its organization, of which all persons dealing with it are bound to take notice; and the abuse of a general power, or the failure to comply with prescribed formalities or regulations, in a particular instance, when such abuse or failure is not known to the other contracting party.

In the leading case of *Colman* v. *Eastern Counties Railway*, 10 Beav. 1, the directors of a railway company were restrained by injunction from carrying out an agreement by which, for the purpose of increasing its traffic, they proposed to guarantee certain profits to, and to secure the capital of, a steam-packet company, to ply between a port near one end of the railway in England and certain foreign ports; and Lord Langdale, M. R., said: "To look upon a railway company in the light of a common partnership, and as subject to no greater vigilance than common partnerships are, would, I think, be greatly to mistake the functions which they perform, and the powers which they exercise of interference, not only with the public but with the private rights of all individuals in this realm. We are to look

upon those powers as given to them in consideration of a benefit which, notwithstanding all other sacrifices, it is to be presumed and hoped, on the whole, will be obtained by the public.  But it being the interest of the public to protect the private rights of all individuals, and to defend them from all liabilities beyond those necessarily occasioned by the powers given by the several acts, those powers must always be carefully looked to; and I am clearly of opinion, that the powers which are given by an act of Parliament, like that now in question, extend no farther than is expressly stated in the act, or is necessarily and properly required for carrying into effect the undertaking and works which the act has expressly sanctioned."  "Ample powers are given for the purpose of constructing and maintaining the railway, and for doing all those things required for its proper use when made; but I apprehend that it has nowhere been stated that a railway company, as such, has power to enter into all sorts of other transactions.  Indeed, it has been very properly admitted that railway companies have no right to enter into new trades or businesses not pointed out by their acts; but it has been contended that they have a right to pledge, without limit, the funds of the company for the encouragement of other transactions, however various and extensive, provided the object of that liability is to increase the traffic upon the railway, and thereby to increase the profit to the shareholders.  There is, however, no authority for anything of that kind.  It has been stated that these things, to a small extent, have frequently been done since the establishment of railways; but unless the acts so done can be proved to be in conformity with the powers given by the special acts of Parliament, under which those acts are done, they furnish no authority whatever."  10 Beav. 14, 15. And after full consideration of the case he summed up his opinion thus:  "To pledge the funds of this company for the purpose of supporting another company engaged in a hazardous speculation is a thing which, according to the terms of this act of Parliament, they have not a right to do."  "They have the power to do all such things as are necessary and proper for the purpose of carrying out the intention of the act of Parliament, and they have no power of doing anything beyond it."  10 Beav. 17, 18. See also *Salomons* v. *Laing*, 12 Beav. 339, 352, 353.

In *Bagshaw* v. *Eastern Union Railway*, 7 Hare, 114; 2 Macn.
& Gord. 389, and 2 Hall & Twells, 201; where a railway com-
pany, authorized by act of Parliament to purchase a branch line,
and to raise a sum of money for the purpose of constructing that
line, applied part of the sum so raised to the construction of its
main line, Vice Chancellor Wigram, and Lord Chancellor Cot-
tenham on appeal, sustained the bill of a shareholder, not only
to restrain such application of the rest of the sum, but also for
an account of the part already illegally expended.

The same principles have been frequently applied in actions
at law.   In *East Anglian Railways* v. *Eastern Counties Railway*,
11 C. B. 775, it was held that no action could be maintained by
one railway company against another upon an agreement made
by the latter to take a lease of the railway of the first com-
pany, and to pay the expenses incurred by that company in the
soliciting and promoting of bills in Parliament for the extension
and improvement of that railway, even if the object and effect
of the agreement were to increase the profits of the defendants'
railway; and Chief Justice Jervis, in delivering the judgment
of himself and Justices Maule, Williams and Talfourd, said:
" This act is a public act, accessible to all, and supposed to be
known to all; and the plaintiffs must therefore be presumed to
have dealt with the defendants with a full knowledge of their
respective rights, whatever those rights may be.   It is clear that
the defendants have a limited authority only, and are a cor-
poration only for the purpose of making and maintaining the
railway sanctioned by the act; and that their funds can only be
applied for the purposes directed and provided for by the statute.
Indeed, it is not contended that a company so constituted can
engage in new trades not contemplated by their act; but it is
said that they may embark in other undertakings, however vari-
ous, provided the object of the directors be to increase the profits
of their own railway.   This, in truth, is the same proposition in
another form; for if the company cannot carry on a new trade,
merely because it was not contemplated by the act, they cannot
embark in other undertakings not sanctioned by their act, merely
because they hope the speculation may ultimately increase the
profit of the shareholders.   They cannot engage in a new trade,
because they are a corporation only for the purpose of making

and maintaining the Eastern Counties Railway. What additional power do they acquire from the fact that the undertaking may in some way benefit their line? Whatever be their object or the prospect of success, they are still but a corporation for the purpose only of making and maintaining the Eastern Counties Railway; and if they cannot embark in new trades, because they have only a limited authority, for the same reason they can do nothing not authorized by their act, and not within the scope of their authority. Every proprietor, when he takes shares, has a right to expect that the conditions upon which the act was obtained will be performed; and it is no sufficient answer to a shareholder, expecting his dividend, that the money has been expended upon an undertaking which at some remote period may be highly beneficial to the line. The public also has an interest in the proper administration of the powers conferred by the act. The comfort and safety of the line may be seriously impaired if the money supposed to be necessary, and destined by Parliament for the maintenance of the railway, be expended in other undertakings not contemplated when the act was obtained, and not expressly sanctioned by the Legislature." "If the contract is illegal, as being contrary to the act of Parliament, it is unnecessary to consider the effect of dissentient shareholders; for if the company is a corporation only for a limited purpose, and a contract like that under discussion is not within their authority, the assent of all the shareholders to such a contract, though it may make them all personally liable to perform such contract, would not bind them in their corporate capacity, or render liable their corporate funds." 11 C. B. 811–813. So in *Macgregor* v. *Dover & Deal Railway*, 18 Q. B. 618, the Court of Exchequer Chamber, in an opinion delivered by Baron Alderson, in which Justices Maule, Cresswell, Williams and Talfourd and Baron Platt concurred, arrested judgment in an action brought by the Dover and Deal Railway Company upon the agreement of a person, interested in the Southeastern Railway Company, to pay the expenses of an application of the latter to Parliament to authorize it to establish a connecting railway, because " both plaintiffs and defendant here must be taken, with full knowledge of the powers conferred on the Southeastern Railway Company, to have made a contract by which the defendant

is to bind the company to do an illegal act; not merely an act which they have no power to do, but an act contrary to public policy and the provisions of a public act of Parliament." 18 Q. B. 632. In each of those cases, the plaintiff had actually incurred and paid the expenses sued for.

Baron Parke stated the rule to be that, where a corporation is created by act of Parliament for particular purposes with special powers, "their deed, though under their corporate seal, and that regularly affixed, does not bind them, if it appear by the express provisions of the statute creating the corporation, or by necessary or reasonable inference from its enactments, that the deed was *ultra vires* — that is, that the Legislature meant that such a deed should not be made." *South Yorkshire Railway* v. *Great Northern Railway*, 9 Exch. 55, 84. See also *Scottish Northeastern Railway* v. *Stewart*, 3 Macq. 382, 415, by Lord Wensleydale.

Lord St. Leonards — while asserting that "the safety of men in their daily contracts requires that this doctrine of *ultra vires* should be confined within narrow bounds;" and that railway companies "have all the powers incident to a corporation, except so far as they are restrained by their act of incorporation," and are "bound by contracts duly entered into by their directors for purposes which they have treated as within the objects of their acts, and which cannot clearly be shown not to fall within them;" and inclining "to restrain the doctrine of *ultra vires* to clear cases of excess of power, with the knowledge of the other party, express, or implied from the nature of the corporation and of the contract entered into" — distinctly recognized that "directors cannot act in opposition to the purpose for which their company was incorporated," nor "bind their companies by contracts foreign to the purposes for which they were established." *Eastern Counties Railway* v. *Hawkes*, 5 H. L. Cas. 331, 371, 373, 381.

Lord Chancellor Cranworth, in the same case, said that the English authorities above cited had "established the proposition that a railway company cannot devote any part of its funds to an object not within the scope of its original constitution, how beneficial soever that object might seem likely to prove;" and, after a review of the cases, repeated, "It must therefore be

now considered as a well-settled doctrine that a company incorporated by act of Parliament for a special purpose cannot devote any part of its funds to objects unauthorized by the terms of its incorporation, however desirable such an application may appear to be." 5 H. L. Cas. 345, 348. His opinion, in which Lord Brougham concurred, upon which the House of Lords held that no action would lie against a railway company on an agreement of its projectors to advance money to construct a pier and harbor at the end of a proposed branch of the railway, is to the like effect. *Caledonian & Dumbartonshire Railway* v. *Magistrates of Helensburgh*, 2 Macq. 391, 416, 417, 422. And he afterwards observed that he thought the statement of Baron Parke, above quoted, "the more correct way of enunciating the doctrine, though practically it makes very little difference whether we say that the railway company has no authority given to it by its incorporation to enter into contracts as to matters not connected with its corporate duties, or that it is impliedly prohibited from so doing, because by necessary inference the Legislature must be considered to have intended that no such contracts should be entered into." *Shrewsbury & Birmingham Railway* v *Northwestern Railway*, 6 H. L. Cas. 113, 135–137.

In *Ashbury Railway Carriage & Iron Co.* v. *Riche*, L. R. 7 H. L. 653, and L. R. 9 Ex. 224, the objects for which a company, registered under the English Joint Stock Companies Act of 1862, was created, were stated in its memorandum of association to be "to make and sell, or lend on hire, railway carriages and wagons, and all kinds of railway plant, fittings, machinery and rolling stock; to carry on the business of mechanical engineers and general contractors; to purchase, lease, work and sell mines, minerals, land and buildings; to purchase and sell, as merchants, timber, coal, metals or other materials, and to buy and sell any such materials on commission or as agents." The directors agreed to purchase a concession for making a railway in a foreign country, and afterwards (on account of difficulties existing by the law of that country) agreed to assign the concession to an association formed there, which was to supply the materials for the construction of the railway, and to receive periodical payments from the English company. In an action at law brought by the foreign associates against the English

company upon this agreement, it was held in the lower courts, as well as in the House of Lords, to be *ultra vires*. The judges below were divided in opinion upon the question whether it had been ratified by the stockholders so as to bind the company. But in the House of Lords it was unanimously held, by Lord Chancellor Cairns and Lords Chelmsford, Hatherley, O'Hagan and Selborne, that the contract was not within the scope of the memorandum of association, and was therefore void and incapable of being ratified, and the action could not be maintained.

Lord Selborne said: " The action in this case is brought upon a contract, not directly or indirectly to execute any works, but to find capital for a foreign railway company, in exchange for shares and bonds of that company. Such a contract, in my opinion, was not authorized by the memorandum of association of the Ashbury Company. All your Lordships, and all the judges in the courts below, appear to be, so far, agreed. But this, in my judgment, is really decisive of the whole case. I only repeat what Lord Cranworth, in *Hawkes* v. *Eastern Counties Railway Company* (when moving the judgment of this House), stated to be settled law, when I say that a statutory corporation, created by act of Parliament for a particular purpose, is limited, as to all its powers, by the purposes of its incorporation as defined in that act. The present and all other companies incorporated by virtue of the Companies Act of 1862 appear to me to be statutory corporations within this principle. The memorandum of association is under that act their fundamental, and (except in certain specified particulars) their unalterable law; and they are incorporated only for the objects and purposes expressed in that memorandum. The object and policy of those provisions of the statute which prescribe the conditions to be expressed in the memorandum, and make these conditions (except in certain points) unalterable, would be liable to be defeated if a contract under the common seal, which on the face of it transgresses the fundamental law, were not held to be void, and *ultra vires* of the company, as well as beyond the power delegated to its directors or administrators. It was so held in the case of the *East Anglian Railway Company*, and in other cases upon railway acts, which cases were approved by this House in *Hawkes's case;* and I am unable to see any

distinction for this purpose between statutory corporations under railway acts, and statutory corporations under the Joint Stock Companies Act of 1862." "I think that contracts for objects and purposes foreign to, or inconsistent with, the memorandum of association, are *ultra vires* of the corporation itself. And it seems to me far more accurate to say that the inability of such companies to make such contracts rests on an original limitation and circumscription of their powers by the law, and for the purposes of their incorporation, than that it depends upon some express or implied prohibition, making acts unlawful which otherwise they would have had a legal capacity to do. This being so, it necessarily follows (as indeed seems to me to have been conceded in Mr. Justice Blackburn's judgment) that, where there could be no mandate, there cannot be any ratification; and that the assent of all the shareholders can make no difference when a stranger to the corporation is suing the company itself in its corporate name, upon a contract under the common seal. No agreement of shareholders can make that a contract of the corporation, which the law says cannot and shall not be so." L. R. 7 H. L. 693–695.

In the very recent case of *Attorney General* v. *Great Eastern Railway*, 5 App. Cas. 473, 478, in which the contract in question was held to be expressly authorized by the terms of the act of Parliament, and therefore not *ultra vires*, Lord Chancellor Selborne, while expressing the opinion that "this doctrine ought to be reasonably, and not unreasonably, understood and applied, and that whatever may fairly be regarded as incidental to, or consequential upon, those things which the Legislature has authorized, ought not (unless expressly prohibited) to be held, by judicial construction, to be *ultra vires*," declared his sense of the importance of maintaining the doctrine of *ultra vires*, as explained in the case of *Ashbury Railway Carriage & Iron Co.* v *Riche*. And Lord Blackburn said, "That case appears to me to decide at all events this, that where there is an act of Parliament creating a corporation for a particular purpose, and giving it powers for that particular purpose, what it does not expressly or impliedly authorize is to be taken to be prohibited; and consequently that the Great Eastern Company, created by act of Parliament for the purpose of working a line of railway, is

prohibited from doing anything that would not be within that purpose;" although he also agreed "that those things which are incident to, and may reasonably and properly be done under, the main purpose, though they may not be literally within it, would not be prohibited." 5 App. Cas. 481.

These statements are the more significant, because Baron Bramwell in the same case below, 11 Ch. D. 449, 501–503, had cast doubts upon the correctness of the decision in the case of *East Anglian Railways* v. *Eastern Counties Railway;* and Lord Blackburn himself, when a justice of the Court of Queen's Bench, had more than once approved Baron Parke's form of stating the doctrine. *Chambers* v. *Manchester & Milford Railway*, 5 B. & S. 588, 610. *Taylor* v. *Chichester & Midhurst Railway*, L. R. 2 Ex. 356, 384. *Riche* v. *Ashbury Railway Carriage & Iron Co.* L. R. 9 Ex. 264.

The same principles have been clearly and positively enunciated in two unanimous judgments of the Supreme Court of the United States.

In *Pearce* v. *Madison & Indianapolis Railroad*, 21 How. 441, two corporations, created by the laws of Indiana to construct distinct though connecting lines of railroad in that State, were consolidated by agreement, and conducted the business of both lines under a common board of management, which gave notes in the name of the consolidated company in payment for a steamboat to be employed on the Ohio River and to run in connection with the railroads. After the execution of the notes and the acquisition of the steamboat, this relation between the corporations was legally dissolved. It was held, that an action brought by an indorsee against the two corporations upon the notes could not be maintained.

Mr. Justice Campbell, in delivering judgment, said: "The rights, duties and obligations of the defendants are defined in the acts of the Legislature of Indiana under which they were organized, and reference must be had to these to ascertain the validity of their contracts. They empower the defendants respectively to do all that was necessary to construct and put in operation a railroad between the cities which are named in the acts of incorporation. There was no authority of law to consolidate these corporations, and to place both under the same

management, or to subject the capital of the one to answer for the liabilities of the other; and so the courts of Indiana have determined. But in addition to that act of illegality, the managers of these corporations established a steamboat line to run in connection with the railroads, and thereby diverted their capital from the objects contemplated by their charters, and exposed it to perils for which they afforded no sanction. Now persons dealing with the managers of a corporation must take notice of the limitations imposed upon their authority by the act of incorporation. Their powers are conceded in consideration of the advantage the public is to receive from their discreet and intelligent employment, and the public have an interest that neither the managers nor stockholders of the corporation shall transcend their authority."

He then referred with approval to the cases of *Colman* v. *Eastern Counties Railway*, *East Anglian Railways* v. *Eastern Counties Railway*, and *Macgregor* v. *Dover & Deal Railway*, above cited, and added: "It is contended, that because the steamboat was delivered to the defendants, and has been converted to their use, they are responsible. It is enough to say, in reply to this, that the plaintiff was not the owner of the boat, nor does he claim under an assignment of the owner's interest. His suit is instituted on the notes, as an indorsee; and the only question is, Had the corporation the capacity to make the contract, in the fulfilment of which they were executed? The opinion of the court is, that it was a departure from the business of the corporation, and that their officers exceeded their authority." Judgment was therefore rendered for the defendants. It is to be observed that in that case there was no suggestion that the plaintiff took the notes sued on without notice of the illegality in the original consideration, which would have presented a different question. *Lexington* v. *Butler*, 14 Wall. 282. *Macon* v. *Shores*, 97 U. S. 272. *Monument Bank* v. *Globe Works*, 101 Mass. 57.

In *Thomas* v. *Railroad Co.* 101 U. S. 71, a railroad corporation, without authority of the Legislature, leased its railroad to three persons for twenty years, for the consideration of one half of the gross sums collected from the operation of the road by the lessees during the term, reserving the right at any time to

terminate the contract and retake possession of the road, paying such damages for the value of the unexpired term as should be determined by arbitration. At the end of five years the corporation resumed possession, and the accounts for that period were adjusted and paid. It was held that no action could be maintained against the corporation to recover the value of the unexpired term. The opinion was delivered by Mr. Justice Miller.

It was argued by the counsel for the plaintiffs in that case that though there was nothing in the language of the charter which authorized the making of this agreement, yet " a corporate body may (as at common law) do any act which is not either expressly or impliedly prohibited by its charter; although where the act is unauthorized by the charter a shareholder may enjoin its execution, and the State may, by proper process, forfeit the charter." But the court said: " We do not concur in this proposition. We take the general doctrine to be in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of corporations organized under legislative statutes are such and such only as those statutes confer. Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others." The court then, after referring to some of the English cases above cited, and particularly to the decision of the House of Lords in *Ashbury Railway Carriage & Iron Co.* v. *Riche*, as establishing " the broad doctrine that a contract not within the scope of the powers conferred on the corporation cannot be made valid by the assent of every one of the shareholders, nor can it by any partial performance become the foundation of a right of action," expressed the opinion that that decision " represents the decided preponderance of authority, both in this country and in England, and is based upon sound principle."

The court indeed further said: " There is another principle of equal importance, and equally conclusive against the validity of this contract, which, if not coming exactly within the doctrine of *ultra vires* as we have just discussed it, shows very clearly that the railroad company was without the power to make such a contract. That principle is, that where a corporation like a

railroad company has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions, which undertakes, without the consent of the State, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the State, and is void as against public policy." This proposition is supported by the cases there cited, and by many others. See *Richardson* v. *Sibley*, 11 Allen, 65, 67 ; *Whittenton Mills* v. *Upton*, 10 Gray, 582 ; *Proprietors of Locks & Canals* v. *Nashua & Lowell Railroad*, 104 Mass. 1 ; *Middlesex Railroad* v. *Boston & Chelsea Railroad*, 115 Mass. 347. But that the decision was not intended to be put exclusively upon this ground is manifest from the terms in which it was introduced, as well as from those in which the general doctrine had been already laid down, and from the concluding sentence of the opinion.

The judgments of the English courts, and of the Supreme Court of the United States, to which we have referred, do but affirm and apply principles long ago declared by this court.

More than fifty years since, Chief Justice Parker said : " The power of corporations is derived only from the act, grant, charter or patent by which they are created. In this Commonwealth the source and origin of such power is the Legislature, and corporations are to exercise no authority, except what is given by express terms or by necessary implication by that body. No vote or act of a corporation can enlarge its chartered authority, either as to the subjects on which it is intended to operate, or the persons or property of the corporators." *Salem Milldam* v. *Ropes*, 6 Pick. 23, 32. And the importance, for the security of the rights of each stockholder, of a steady adherence to the principle that " corporations can only exercise their powers over their respective members for the accomplishment of limited and well-defined objects," was strongly stated by Chief Justice Shaw in 1839. *Spaulding* v. *Lowell*, 23 Pick. 71, 75.

As was observed in *Morville* v. *American Tract Society*, 123 Mass. 129, 136, " The power to make all such contracts as are necessary and usual in the course of business, or are reasonably

incident to the objects for which a private corporation is created, is always implied where there is no positive restriction in the charter." Thus a corporation may let or mortgage property lawfully held by it under its charter, and not immediately needed for its own business. *Simpson* v. *Westminster Hotel Co.* 8 H. L. Cas. 712. *Brown* v. *Winnisimmet Co.* 11 Allen, 326. *Hendee* v. *Pinkerton*, 14 Allen, 381. A corporation established "for the purpose of manufacturing and selling glass" may contract to purchase glassware from a like corporation to keep up its own stock and supply its customers while its works are being put in repair. *Lyndeborough Glass Co.* v. *Massachusetts Glass Co.* 111 Mass. 315. A corporation authorized to purchase and hold water power created by the erection of dams, and to hold real estate, may, when the water power has been lawfully extinguished, sell its lands, and as part of the contract of sale agree to raise their grade. *Dupee* v. *Boston Water Power Co.* 114 Mass. 37. A railroad corporation may agree to transport as a common carrier over connecting railroads goods intrusted to it for carriage over its own line. *Hill Manuf. Co.* v. *Boston & Lowell Railroad*, 104 Mass. 122. *Railway Co.* v. *McCarthy*, 96 U. S. 258. And it cannot dispute its liability for goods delivered to it to be carried over a railroad of which it is in actual possession and use under a lease, on the ground that the lease is void. *McCluer* v. *Manchester & Lawrence Railroad*, 13 Gray, 124.

Several of the cases most relied on by the plaintiffs were not suits against a corporation to compel it to pay money for a purpose not within the scope of its charter, but suits by a corporation to recover money or property, which, when recovered, would be held for the lawful uses of the corporation. *Chester Glass Co.* v. *Dewey*, 16 Mass. 94. *Old Colony Railroad* v. *Evans*, 6 Gray, 25. *National Pemberton Bank* v. *Porter*, 125 Mass. 333. *National Bank* v. *Matthews*, 98 U. S. 621.

In *Chester Glass Co.* v. *Dewey*, the plaintiff, a corporation established for the purpose of manufacturing glass, kept a shop near its factory, for the accommodation of its workmen, containing a general assortment of such goods as are usually kept in country stores ; and the defendant was a carpenter, living near, who made boxes and did other carpenter's work for the corporation.

In an action for the price of goods sold and delivered to him from the shop, the defendant objected that the plaintiff was not authorized by law to keep such a shop and to sell goods in this manner; and it was held that this objection could not avail him. The leading reason assigned was, " The Legislature did not intend to prohibit the supply of goods to those employed in the manufactory; " in other words, the contract sued on was not *ultra vires*. That reason being decisive of the case, the further suggestion in the opinion, " Besides, the defendant cannot refuse payment on this ground; but the Legislature may enforce the prohibition, by causing the charter to be revoked, when they shall determine that it has been abused," was, as has been since pointed out, wholly *obiter dictum*. *Whittenton Mills* v. *Upton*, 10 Gray, 599.

In *Old Colony Railroad* v. *Evans*, the defendant, being under contract to haul a large quantity of gravel on to lands belonging to the city of Boston, made an agreement in writing with the plaintiff corporation, by which it agreed to purchase a tract of land in Quincy, and he agreed to take gravel therefrom, and to carry it in his own cars over the plaintiff's road to Boston, paying a specified toll; the defendant afterwards further agreed in writing that, if the plaintiff would purchase another tract for the same purpose, he would pay the cost of the first tract; and both tracts were purchased by the plaintiff. The objection that the corporation had no right to trade in gravel or land was raised by the defendant by way of defence to a bill in equity by the corporation for specific performance of his second agreement by accepting a deed of and paying for the first tract. There can be no doubt of the correctness of the decision overruling the objection. The corporation by its purchase had acquired a title to the land, which was good against all the world, except possibly the Commonwealth; and the defendant, having knowledge of all the facts, did not and could not object that the title might be defeasible by the Commonwealth. *Banks* v. *Poitiaux*, 3 Rand. 136. *Leazure* v. *Hillegas*, 7 S. & R. 313. *Goundie* v. *Northampton Water Co.* 7 Penn. St. 233. *Silver Lake Bank* v. *North*, 4 Johns. Ch. 370, 373. *Smith* v. *Sheeley*, 12 Wall. 358. *Commonwealth* v. *Wilder*, 127 Mass. 1, 6. Although it was said in the opinion, that the purchase of the land seemed to have been

made as a mode of promoting the purposes of the plaintiff's incorporation, the increasing of its business in transportation upon its railroad, and not as an object of trade or speculation in lands, the point adjudged was that the want of corporate capacity to purchase and sell lands was not a legal objection to the maintenance of the bill. The only authority referred to by the court was the treatise of Angell & Ames on Corporations, §§ 10, 11, 151, 153, of which the section most directly applicable is § 153, in which it is clearly laid down that a court of equity will enforce against a natural person his agreement to purchase of a corporation lands which it holds in violation of its charter, but will not enforce against a corporation its agreement to purchase lands for a purpose not authorized by its charter. The distinction is obvious. In the latter case, to enforce the agreement against the corporation is to compel the application of its funds to a purpose not authorized by law. In the former case, to compel the individual to take and pay for the property according to his agreement is the surest and most effectual means of replacing in the treasury of the corporation, for its lawful uses and the benefit of its stockholders, the funds which it had misapplied. *Rutland & Burlington Railroad* v. *Proctor*, 29 Vt. 93, 97.

In *National Pemberton Bank* v. *Porter*, the point decided was, that the objection that a national bank had exceeded its powers by purchasing a promissory note from an indorsee thereof did not prevent it from maintaining an action upon the note against the maker; for the reasons, that the action was not brought upon the contract of purchase, or against any party to that contract, and that it was not necessary in this Commonwealth that the plaintiff in an action on the promissory note should have any title or interest in it. See also *Attleborough National Bank* v. *Rogers*, 125 Mass. 339.

In *National Bank* v. *Matthews*, the act of Congress providing that a national bank might purchase and hold real estate for certain enumerated purposes only, of which to secure money lent at the time of taking a mortgage was not one, was held by a majority of the court, in accordance with the opinion of Chancellor Kent in *Silver Lake Bank* v. *North*, above cited, not to make void a mortgage given to secure the payment of

a promissory note for money so lent, nor to prevent the bank from enforcing such a mortgage. A like decision was made in *National Bank* v. *Whitney*, 103 U. S. 99.

A corporation may indeed be bound to refund to a person, from whom it has received money or property for a purpose unauthorized by its charter, the value of that which it has actually received; for, in such a case, to maintain the action against the corporation is not to affirm, but to disaffirm, the illegal contract. *White* v. *Franklin Bank*, 22 Pick. 181. *Morville* v. *American Tract Society*, 123 Mass. 129, 137. *In re Cork & Youghal Railway*, L. R. 4 Ch. 748. But when the corporation has actually received nothing in money or property, it cannot be held liable upon an agreement to share in, or to guarantee the profits of, an enterprise which is wholly without the scope of its corporate powers, upon the mere ground that conjectural or speculative benefits were believed by its officers to be likely to result from the making of the agreement, and that the other party has incurred expenses upon the faith of it. *East Anglian Railways* v. *Eastern Counties Railway*, *Macgregor* v. *Dover & Deal Railway*, *Ashbury Railway Carriage & Iron Co.* v. *Riche* and *Thomas* v. *Railway Co.*, above cited. *Downing* v. *Mt. Washington Road Co.* 40 N. H. 230. *Franklin Co.* v. *Lewiston Institution for Savings*, 68 Maine, 43.

The Old Colony Railroad Company is a railroad corporation, established by public statutes of the Commonwealth for the purpose of constructing and maintaining a railroad and carrying passengers and freight thereon. Sts. 1844, *c.* 150; 1854, *c.* 133; 1862, *c.* 149; 1872, *c.* 143. The holding of a " world's peace jubilee and international musical festival " is an enterprise wholly outside the objects for which a railroad corporation is established; and a contract to pay, or to guarantee the payment of, the expenses of such an enterprise, is neither a necessary nor an appropriate means of carrying on the business of the railroad corporation, is an application of its funds to an object unauthorized and impliedly prohibited by its charter, and is beyond its corporate powers. Such a contract cannot be held to bind the corporation, by reason of the supposed benefit which it may derive from an increase of passengers over its road, upon any grounds that would not hold it equally bound by a contract to

partake in or to guarantee the success of any enterprise that might attract population or travel to any city or town upon or near its line. It follows that in the first of the actions before us there must be                              *Judgment for the defendant.*

The same reasons are no less applicable to manufacturing and trading corporations, established under general laws, and the purposes of which are required by those laws to be stated in their articles of association. The Smith American Organ Company was organized under the general act of 1870, *c.* 224, and the purposes of its incorporation are limited by its articles of association, as appearing in the certificate thereof filed in the office of the Secretary of the Commonwealth pursuant to that act, to " the manufacture and sale of reed organs and other musical instruments." The power to manufacture and sell goods of a particular description does not include the power to partake in, or to guarantee the profits of, an enterprise that may be expected to increase the use of or the demand for such goods. The case of *Ashbury Railway Carriage & Iron Co.* v. *Riche,* before cited, is directly in point.

This ground being decisive of the second action, it becomes unnecessary to consider the other objections to its maintenance, and the plaintiffs' exceptions must be                              *Overruled.*

*M. F. Dickinson, Jr. & J. Fox,* for the plaintiffs.

*J. H. Benton, Jr.,* for the defendant in the first case.

*R. D. Smith,* (*C. Allen* with him,) for the other defendant.