SAFETY INSULATED WIRE & CABLE CO. v. MAYOR, ETC., OF BALTIMORE.

(Circuit Court of Appeals, Fourth Circuit. May 5, 1896.)

No. 162.

1. CORPORATIONS—ULTRA VIRES—ACTION ON EXECUTORY CONTRACT.
   In an action brought by a corporation for the breach of an executory contract, the defendant can set up as a defense the want of authority of the plaintiff, under its charter, to enter into such contract.

2. SAME.
   A corporation whose charter states the object of its organization to be "to carry on the business of manufacturing compositions * * * for the insulation and protection of wires, cables and other articles, * * * preparing * * * cables and other articles * * * by the use * * * of such compositions, * * * and the manufacture * * * of tubing, hose and all other articles, * * * and all business * * * incident thereto and connected therewith," has no power to enter into a contract for the construction of a system of underground wiring in the streets of a city, including, besides the manufacture and supplying of insulated cables, the construction of trenches and conduits, filling and repairing pavements after such construction, supplying masonry and ironwork for manholes, handholes, etc.; such work representing about a third of the total estimated expenditure under the contract, which also requires a guaranty against damages caused by the construction, and a penalty for delay in completing the work.

3. ACTION—GROUND OF RECOVERY.
   In an action brought to recover damages for the breach of a contract which is held to be invalid because of the want of capacity of one of the parties, there can be no recovery for a sum of money deposited as security for the execution of the contract.

In Error to the Circuit Court of the United States for the District of Maryland.

This was an action by the Safety Insulated Wire & Cable Company against the mayor and city council of Baltimore to recover damages for the failure of the city to perform a contract with the plaintiff. A decision of the circuit court overruling a demurrer to a special plea to the declaration was reversed by this court (13 C. C. A. 375, 66 Fed. 140), and the cause was then tried on the merits; a verdict being rendered for the defendant, by direction of the court. Plaintiff brings error. Affirmed.

This case comes up by writ of error to the circuit court of the United States for the district of Maryland. The city of Baltimore, being desirous of placing the wires of the police, fire alarm, telegraph, and police patrol systems of that city underground, obtained the authority of the general assembly of Maryland to do this, and to provide for the expense thereof. Acting under this authority. an ordinance was passed by the mayor and city council of Baltimore, instructing certain officials of that city, as a commission, to advertise for proposals to furnish cables, conduits, and trenching, separately or as a whole, when it may be necessary, within such boundaries as the commission may determine. This commission accordingly did advertise for proposals for this work, with plans and specifications, and received bids. The Safety Insulated Wire & Cable Company, a corporation created under the laws of New York, among others, put in its bid to perform all the said work according to the plans and specifications for the sum of $97,985. On the 28th June, 1893, this bid was duly accepted. On 30th June of the same year the Safety Insulated Wire & Cable Company informed the president of the commission that it was then and there prepared to execute the contract for furnishing and laying conduits, furnishing and drawing in electric cables, and constructing manholes, for the police and fire-alarm telegraph and police-patrol systems of the city, in accordance with the terms of advertisement, and tendered the signature of the proper officers, and seal of the company, for the execution of the contract. On the same day the commission refused to carry out the contract, or to proceed any further therein. Thereupon the Safety Insulated Wire & Cable Company brought its action against the mayor and city council of Baltimore for breach of contract; filing with its declaration a bill of particulars, which will hereafter be set out. The defendants appeared, and pleaded the general issue, on which issue was joined. At the trial they asked leave to file a special plea that the charter of the plaintiff does not authorize it to make such a contract as is set forth in the declaration. The filing of this plea was refused; the court being of the opinion that the jury having been sworn, the same matter can be more properly put in under the general issue, and ruled upon by an instruction from the court. At the conclusion of the trial the jury, under the instruction of the court, found a verdict for the defendant. Exceptions were duly taken, and the case comes here upon them and the assignments of error. The bid of the plaintiff, accepted by the defendant, is set out in the record. Under it the plaintiff agreed to furnish the cables, trenching, laying new conduits where necessary, filling in and repaving after conduits are laid, make all connections, and furnish everything in accordance with specifications on file. It then goes on, and states minutely of what the cables shall be composed, the wires insulated, conductors twisted and grouped, the whole encased in lead. How the conduits shall be furnished, the ducts to be of wrought-iron pipe, treated inside and out with preservative coating of asphaltum, with subsidiary ducts. All ducts to be laid on solid earth formation at least two feet below the surface of the streets, specifying minutely how the joints and connections shall be made and edges smoothed. How bends shall be constructed and secured. That 12 full-sized manholes shall be made, of best-quality hard brick, laid in first-quality cement, and provided with heavy flanged surface frame, with improved inner cover and lock bar, and also with heavy street cover. Hand-holes, 190 in number, to be made of cast-iron pans or boxes, with side openings, for connection with pipe ducts, and provided with covers and suitable fastenings. The boxes to be set firmly at a depth of about two feet below the surface of the street. A space the full size of the box to be extended up

to the surface of the street, to be provided with heavy iron frame. All excavations to be done for trenching of manholes and handholes in a manner to avoid interference with present underground pipes. All filling to be well rammed, to insure solid foundation for conduits and street traffic. Paving carefully relaid, and made as good as before excavating. House boxes of black walnut, and approved lightning arresters, shall be furnished for all such underground wires at each house as are there connected to aërial currents; and, in all cases where the cable is required to be extended to the top of a pole, there shall be furnished proper pole boxes and lightning arresters. All this work was to be done in the public streets of the city of Baltimore, in the principal part of that city, utilizing the subways and conduits of the Chesapeake & Potomac Telephone Company as far as possible, but continuing and carrying out the work into all portions of the required territory outside of these subways and conduits. The several parts of this contract are the furnishing of the insulated wires and cables, properly constructed; the digging of trenches for the bed of the cables at least two feet deep in the public streets (in some cases it appears that the trenches were nine feet deep); excavating for manholes, carefully avoiding other underground pipes; the masonry work and iron work necessary for them and the handholes; filling all excavations; repairing and restoring all openings in the streets. By the ordinances of the city, every contractor was required to insert in his bond, as one of its conditions, a covenant to hold the city harmless against any suits, loss, or damage for any default or negligence in the work. The charter of the plaintiff was issued under the general provisions of an act of the legislature of the state of New York passed 17th February, 1848, entitled "An act to authorize the formation of corporations for manufacturing, mining, mechanical or chemical purposes." The certificate of incorporation filed under the provisions of this act has this clause: "Second. The objects for which the said company is formed are as follows, viz.: To carry on the business of manufacturing compositions or compounds, or preparations of India rubber, gutta percha and other gums and substances by any invention, process or method soever for the insulation and protection of wires, cables and other articles soever; and the business of preparing, insulating and protecting wires, cables and other articles soever, by the use, aid or application of such compositions or compounds. And the manufacture, with or without the use or aid of such compositions or compounds, tubing, hose, packing, and all other articles soever, and all business, acts and things incident thereto and connected therewith." The seventh clause is in these words: "Seventh. The said company is formed for the purpose of carrying on some part of its business out of the state of New York, namely, in the states of New Jersey, Connecticut, and elsewhere."

William Pinkney Whyte and M. N. Packard, for plaintiff in error.

William S. Bryan, Jr., and Thomas G. Hayes, for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and PAUL, District Judge.

SIMONTON, Circuit Judge (after stating the facts as above). The assignments of error present two questions which are decisive of this case: First. Can the defendant set up as a defense the want of authority in the plaintiff, under its charter, to enter into the contract for the breach of which it seeks damages? Second. Has the plaintiff, under its charter, the power to enter into the contract set out in the pleadings?

The action is for the breach of an executory contract. Was there a contract? Were the parties to it competent to contract? In Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24,

11 Sup. Ct. 478, in which this doctrine is elaborately discussed, the court says:

"Upon the authority and duty of a corporation to exercise the powers granted it by the legislature, and those only, and upon the invalidity of any contract made beyond their powers, or providing for their disuse or alienation, there is no occasion to refer to decisions of other courts, because the judgments of this court, especially those delivered within the past twelve years by the late Mr. Justice Miller, afford satisfactory guides and ample illustrations. After collaborating and discussing these cases, the general principle is stated that contracts of a corporation beyond the scope of powers enumerated in its charter (read in the light of any general laws which are applicable), and other powers not fairly incidental thereto, are unlawful and void."

In that case a nonsuit was ordered because it appeared that the contract sued upon was not within the powers of the charter of the plaintiff corporation. Sustaining the nonsuit, the court says:

"The contract sued on being clearly beyond the powers of the plaintiff corporation, it is unnecessary to determine whether it is ultra vires of the defendant, because, in order to bind either party, it must be within the corporate powers of both." Page 54, 139 U. S., and page 478, 11 Sup. Ct. "It was argued," says the court, further, "that, even if the contract sued on was void because ultra vires and against public policy, yet having been fully performed on the part of the plaintiff, and the benefits of it received by the defendant for the period covered by the declaration, the defendant is estopped to set up the validity of the contract as a defense to this action to recover the compensation agreed on for that period. But this argument, though sustained by decisions in some states, finds no support in the judgment of this court."

The case has been affirmed in Navigation Co. v. Hooper, 160 U. S. 524, 16 Sup. Ct. 379.

In Thomas v. Railroad Co., 101 U. S., at page 86, speaking of a contract made by a corporation, part of which had been performed:

"But what is sought in the case before us is in the enforcement of the unexecuted part of the agreement. * * * There remains unperformed the covenant to arbitrate with regard to the value of the contract. It is the damages provided for in that clause of the contract that are sued for in this action,—damages for a material part of the contract never performed; damages for the value of a contract which was void."

In Pennsylvania R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 9 Sup. Ct. 770, the same idea is carried out:

"According to many recent opinions of this court, a contract made by a corporation, which is unlawful and void because beyond the scope of its corporate powers, does not, by being carried into execution, become lawful and valid; but the proper remedy of the party aggrieved is by disaffirming the contract, and suing to recover, as on a quantum meruit, the value of what the defendant has actually received the benefit of."

"I think," said Lord Selborne in Iron Co. v. Riche, L. R. 7 H. L. 693, "that contracts for objects and purposes foreign to, or inconsistent with, the memorandum of association, are ultra vires of the corporation itself. And it seems to me far more accurate to say that the inability of such company to make such contracts rests on an original limitation and circumscription of their powers by the law, and for the purposes of their incorporation, than that it depends on some express or implied prohibition making acts unlawful which otherwise they would have legal capacity to do."

The text writers also sustain this doctrine. Mor. Priv. Corp. § 685, and cases quoted. In 27 Am. & Eng. Enc. Law, p. 361, the cases are gathered, and this principle stated:

"Contracts of corporations, involving an unauthorized exercise of their powers, so long as they remain purely executory, are not enforceable, either by an action for specific performance, or for damages. When neither party has acted upon the contract, the only injustice caused by a refusal to enforce it is the loss to the party of prospective profits, and this is too slight a consideration to weigh against the reasons of public policy for declaring it void and not enforceable."

The most modern as well as the most exhaustive treatise on Corporations, by Thompson, goes into this question at great length. In section 6028, discussing the doctrine of some of the cases that violation of the charter, or want of power, cannot be set up collaterally,—that is to say, no individual can set up as a defense an act of the corporation which is wrongful only as against the state, which the state alone can impeach in a direct proceeding,—he adds·

"The principle, no doubt, is a sound one, when the corporation whose charter has been violated attempts to set up its own violation of its charter, and thus derive an advantage from its own wrong; but its application in a case where the corporation is seeking to recover in respect of a contract it had no power to make is not perceived, and in such case the maxim, 'Ex turpi contractu non oritur actio,' applies."

He again discusses it in sections 6033, 6034, with the same result. One of the cases in his text, Drug Co. v. Robinson, 81 Mo. 18, puts the extreme doctrine thus:

"The question of ultra vires can only be raised in a direct proceeding by the state against the corporation, and not in a collateral proceeding by another, except when the charter of the corporation not only specifies, and therefore limits it to, the business in which it may engage, or by express terms, or by a fair implication from its terms, invalidates transactions outside of its legitimate corporate business."

If, then, a contract made by a corporation ultra vires be also entirely void, it is no contract, for one of the parties to it is not competent to contract. It gives no foundation for a right of action. And, if no benefits have accrued to the other party, no equitable consideration can come in. So, whatever may be the rule as to contracts executed in whole or in part, with regard to contracts executory no action can be maintained upon them. If in the plaintiff's case this is made to appear, he has failed to make out an essential part of his case, and must be dismissed, or if it appear in the defendant's proof the verdict must be for the defendant. The circuit court committed no error in its ruling on this point.

Is the contract in question within the scope of the charter of the plaintiff? The rule laid down by the supreme court upon this subject is clear. In Green Bay & M. R. Co. v. Union Steamboat Co., 107 U. S. 98, 2 Sup. Ct. 221, it is thus expressed:

"The charter of a corporation, read in connection with the general laws applicable to it, is the measure of its powers, and a contract manifestly beyond these powers will not sustain an action against the corporation. But whatever, under the charter and other general laws, reasonably construed, may

fairly be regarded as incidental to the objects for which the corporation is created, is not to be taken as prohibited."

The same rule is followed and illustrated in Ft. Worth City Co. v. Smith Bridge Co., 151 U. S. 294, 14 Sup. Ct. 339. The same rule was recognized and applied in Navigation Co. v. Hooper, 160 U. S. 524, 16 Sup. Ct. 379. The court quote with approval the language of Lord Selborne, Ch., in Attorney General v. Great Eastern Ry. Co., 5 App. Cas. 473:

"This doctrine [ultra vires] ought to be reasonably, and not unreasonably, understood and applied; and that whatever may be fairly regarded as incidental to or consequential upon those things which the legislature has authorized ought not, unless expressly prohibited, to be held by judicial construction to be ultra vires."

The court also quotes and adopts the language of Bigelow, C. J., in Brown v. Winnisimmet Co., 11 Allen, 326:

"We know of no rule or principle by which an act creating a corporation for certain specific objects, or to carry on a particular trade or business, is to be strictly construed as prohibitory of all other dealings or transactions not coming within the exact scope of those designated. Undoubtedly the main business of a corporation is to be confined to that class of operations which properly appertain to the general purposes for which its charter was granted. But it may also enter into and engage in transactions which are incidental or auxiliary to its main business, which may become necessary, expedient, or profitable in the care and management of the property which it is authorized to hold under the act by which it was created."

In Green Bay & M. R. Co. v. Union Steamboat Co., supra, a railroad corporation whose road extends across the state of Wisconsin, from Lake Michigan to the Mississippi river, was authorized by its charter to make "such contracts with any other person or corporation whatsoever as the management of its railroad and the convenience and interest of the corporation and the conduct of its affairs may in the judgment of its directors require." The general laws of Wisconsin authorized railroads with termini on the eastern shore of Lake Michigan to make contracts of connection with other railroads, and to build, construct, and run steamboats. It was held that under this charter it had authority, for the purpose of carrying passengers and freight in connection with its own railroad and business, to enter into an agreement with proprietors of steamboats running by way of the Great Lakes, between the eastern terminus and Buffalo, by which it guarantied that the gross earnings of each boat for two years shall amount to a certain sum. In Ft. Worth City Co. v. Smith Bridge Co., supra, it was held that a corporation created for the purpose of dealing in lands, and to which was expressly granted the power to purchase, subdivide, sell, and make any contract essential to the transaction of its business, possesses, as fairly incidental, the power to incur liability in respect to securing better facilities for transit to and from the lots of lands which it is its business to acquire and dispose of. The contract in that case was for building a public bridge across a river running through its lands, binding the corporation to pay one-third of its cost, and to pay in bonds jointly executed by itself and another corporation. In Navigation Co. v. Hooper, supra, a railroad company had leased an hotel at one of

its termini at a fixed sum for rent, and an agreement to keep the premises insured. The question was, was this an incident to its business? It was held that, when no legislative prohibition is shown, it is within the chartered powers of a railroad company to lease and maintain a summer hotel at its seaside terminus, and such power is conferred on railroads in Florida; that it was responsible on the contract to insure, as well as on the contract for rent. In the Massachusetts case (11 Allen) above cited, Chief Justice Bigelow illustrates the general proposition above quoted. A company incorporated for manufacturing cotton and wool could not invest all its capital in mill powers and machinery, and lease them out to others. Nor could it confine its operations to making steam engines and machines for sale. But it could lease a part of its water power, or employ for another so much of its steam power, as is not required for its own use. So, also, a stage coach company or street railway cannot engage in the transportation of passengers by land or sea by steam. But they can let out occasionally a coach or car, or contract for employment of their horses in another occupation when their business does not require them. In Davis v. Railroad Co., 131 Mass. 258, in a most elaborate opinion by Gray, C. J. (now Mr. Justice Gray, of the supreme court of the United States), the court held that the Smith American Organ Company, organized under a general act, the purpose of whose organization was the manufacture and sale of reed organs and other musical instruments, could not, in addition to the power to manufacture and sell goods of a particular description, partake in, or guaranty the profits of, an enterprise that may be expected to increase the use or the demand for such goods. In Iron Co. v. Riche, L. R. 7 H. L. 653, and L. R. 9 Exch. 224, the objects for which a company was created was stated in its memorandum of association to be "to make and sell, or lend or hire, railway carriages and wagons, and all kinds of railway plant, fittings, machinery, and rolling stock; to carry on the business of mechanical engineers and general contractors; to purchase, lease, work, and sell mines, minerals, land, and buildings; to purchase and sell, as merchants, timber, coal, metals, and other materials; and to buy and sell any such materials on commission, or as agents." The directors agreed to purchase a concession for making a railway in a foreign country, and afterwards, on account of difficulties existing by the law of that country, agreed to assign the concession to an association formed there, which was to supply the materials for the construction of the railway, and to receive periodical payments from the English company. In an action brought by the foreign association against the English company upon this agreement, it was held in all the lower courts, as well as in the house of lords, ultra vires and void. Many English cases on railway corporations are cited, and the court held that on this question they saw no difference between railway corporations and those organized under the joint-stock company act. The case of Davis v. Railroad Co., supra, in which the English case above quoted is com-

mented upon, after laying down the rule stated in Morville v. Society, 123 Mass. 129, that the power to make all such contracts as are necessary and usual in the course of business or as reasonably incident to the objects for which a private corporation is created is always implied when there is no positive restriction in the charter, proceeds to give instances. Thus, a corporation may let a mortgage property lawfully held by it under its charter, and not immediately needed for its own business. Simpson v. Hotel Co., 8 H. L. Cas. 712; Brown v. Winnisimmet Co., 11 Allen, 326, quoted supra. A corporation established for the purpose of "manufacturing and selling glass" may contract to purchase glassware from a like corporation, to keep up its own stock and supply its customers while its works are being repaired. Lyndeborough Glass Co. v. Massachusetts Glass Co., 111 Mass. 315. A corporation authorized to purchase and hold water power created by the erection of dams, and to hold real estate, may, when the water power has been lawfully extinguished, sell its lands, and, as part of the contract, agree to raise the grade. Hill Manuf'g Co. v. Boston & L. R. Corp., 104 Mass. 122; Railway Co. v. McCarthy, 96 U. S. 258. But it is impossible to exhaust the citation of authorities. It is evident that no general principle can be laid down, whereby, with absolute certainty, it can be determined that many transactions are or are not among the incidents to the business of a corporation, authorized by its charter. The answer to the question must depend upon the facts of each particular case. Lyde v. Railway Co., 36 Beav. 10.

It is necessary to examine this charter. As has been seen, the plaintiff was incorporated under a general law of New York: (1) To carry on the business of manufacturing compositions or compounds for the insulation of wires, cables, and all other articles soever. (2) The business of preparing, insulating, and protecting such wires, etc., with the use, aid, or application of such compounds. (3) The manufacture, with or without the use of such composition or compounds, tubing, hose, packing, and all articles soever. (4) All business, acts, and things incident to or connected therewith. The primary—indeed, the sole—business of the corporation was to manufacture. Is the contract incident thereto, and connected therewith? An incidental power is one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has slight or remote relation to it. Hood v. Railroad Co., 22 Conn. 1. The city of Baltimore, under the authority of the legislature, proposed to put all the wires needed for its police, fire-alarm, and police-patrol systems underground, instead of on poles in the streets. The advertisement for bids called for sealed proposals for furnishing the cables, trenching, and laying new conduits where necessary, for the underground wires of these systems. The proposals embraced a penalty of $20 per day for each day's delay in performing the contract. And by an ordinance of the city the contractor was required to enter into bond as a protection for the city against all damages arising from

the opening of the streets. The offer of plaintiff, which was accepted, included the furnishing of cables, trenching, and laying new conduits when necessary, filling in and repairing after conduits are laid, making all connections, and furnishing everything in accordance with specifications; that is to say, the manufacture of insulating composition or compounds, the covering of wires with such compound, the construction of cables, furnishing such wires and cables, and, with these, masonry work, iron work, excavation of soil, grading, and engineering work of this character, refilling and paving the streets. The estimate of the relative value of these items by plaintiff is shown in the bill of particulars:

Cost of raw materials, copper wire, rubber compound, tape, and
lead ........................................................................ $30,000 00
Cost of labor to manufacture cables................................. 12,000 00
Cost of transportation of cables and distributing same in streets... 1,000 00
                                                                   —————
                                                                   $43,000 00
Cost of trenching, pipes, manholes, laying cables and connections,
and restoring streets....................................................... 21,000 00
                                                                   —————
                                                                   $64,000 00

Thus, in addition to the manufacture, preparing, and furnishing the cables and wires, the other parts of the contract cost $^{21}/_{64}$ of the entire outlay,—about ⅓.

At the trial the evidence tended to show that the cable would cost.. $20,106 96
Trenching, construction, etc., adding 2 per cent. for contingencies.. 45,165 57
                                                                   —————
                                                                   $65,272 53

To all parts of this contract, except the cables and wires, plaintiff had to rely on subcontractors. In what way is this large addition of work and materials to the furnishing the cables and wires incident to the business of manufacturing insulating compositions, and applying the same, and in what way is it connected therewith? It is difficult to see any other than the means and opportunity of selling the cables and wires when manufactured and insulated. But if a manufacturing company, in addition to the preparation of its goods for market, can enter into any contract which would tend to increase the consumption of its goods, and promote their sale, it is impossible to fix a limit to its powers. Speaking of an analogous case, the supreme court of errors of Connecticut, in the case quoted from 22 Conn., supra, says:

"It would be absurd to hold that the directors, under the idea of incidental powers, might do everything which they thought would bring passengers to their road. Such a limit is no limit. If they could do this under such a pretense, they could, by direct appropriation of the company's funds, build manufacturing villages along the road, and run steamboats to New York in connection with their road, for this might increase their business."

The case in 160 U. S., and 16 Sup. Ct., above cited, is peculiar in its character. It was upon an executed contract respecting the use and protection of an hotel rented by the railroad company on a barren beach, one of its termini, essential for the accommodation of its passengers and employés. The court put its conclusion largely on this.

"To maintain cheap hotels or eating houses at stated points on a long line of railroad through a wilderness, as in the case of the Pacific railroads, or at the end of a railroad on a barren, unsettled beach, as in the present case, not for the purpose of making money out of such business, but to furnish reasonable and necessary accommodations for its passengers and employés, would not be so plainly an act outside of the powers of a railroad company as to compel the court to sustain a defense of ultra vires as against the other party to such contract. Besides this, the general law of Florida, in which state the contract was made, permitted railroad companies to erect and maintain all convenient buildings for the accommodation and use of their passengers."

The right to keep and maintain the rented hotel rendered obligatory the covenant to insure it, which was a part of the rent.

The present case is more analogous to Davis v. Railroad Co., 131 Mass. 276, which holds that:

"The power to manufacture and sell goods of a particular description does not include the power to partake in, or to guaranty the profits of, an enterprise that may be expected to increase the use of the demand for such goods."

If the case be considered from the standpoint of the stockholders in this corporation, the correctness of this position will be more clear. The company was incorporated for the manufacture of insulated cables and wires, etc. The stockholders went into this adventure, and risked their capital. Clearly, they incurred obligations for the excellence and market value of their manufactured products. This risk they knowingly took. Under the contract in question, they were made to encounter the risk of damages for building masonry, ironwork, and proper paving, and restoration of streets in a crowded city, and all accidents occurring from the opening of the streets. Could these results have been indicated to them by anything in the articles of incorporation? Is it enough to say to them that by incurring a cost of $45,000, and all the danger for damages for any deficit or accident in its performance, a sale of $20,000 worth of the manufactured product has been effected? It cannot be said that anything which will promote a demand for goods manufactured under the charter is within the incidental powers of the corporation. Were this true, a corporation organized for the business of quarrying rock could contract for the erection of a costly building, in the construction of which its rock could be used. A corporation organized for the manufacture of terra-cotta pipes could contract for the sewerage of a large city. The circuit court did not err in its ruling on this point, as the contract was not within the powers of the plaintiff corporation.

One more assignment of error will be noticed. Under the terms of the advertisement, each bidder deposited a check for $1,000, which it was stated would be returned to each unsuccessful bidder. Plaintiff now claims the return of this sum, as a part of the damages for the breach of contract. The present action is at law, for breach of contract. As has been seen, there was no contract, as one of the parties was not competent to contract. This being so, this sum cannot be recovered in this action, which does not lie. It may, perhaps, be recoverable in another and more appropriate form of action. The judgment of the circuit court is affirmed.