## SMITH v. THE ALABAMA LIFE INSURANCE AND TRUST COMPANY.

1. A company was incorporated with a capital of one million of dollars, to be paid-in, in cash, and such other money as it might receive in trust, one half of which capital of one million, it was required to invest in bonds or notes secured by mortgage on land within the State of Alabama, and the remaining half of the capital stock, together with the premiums and profits received by the company and the monies received in trust, might, in the discretion of the company, be invested in stocks—loaned to any city, county, or company—or be invested in such *real or personal securities*, as it might deem proper—Held, that the company could not lend its *credit*, by making bonds to fall due in future, and exchange such bonds for the bonds of an individual for the same amount; and that the bond so taken was void.

ERROR to the Chancery Court at Camden.

This bill was filed by the defendant in error to foreclose a mortgage executed on real estate, to secure the payment of seven thousand five hundred dollars, secured by a bond for that amount, with the following condition:

The condition of the said obligation is such, that whereas, the said Archibald K. Smith, is indebted to the Alabama Life Insurance and Trust Company in the said sum of seven thousand five hundred dollars, which sum is intended to be secured by this bond and mortgage.

Now if the said Archibald K. Smith shall pay, or cause to be paid, the said sum of seven thousand five hundred dollars, in manner and form following, that is to say: one fifth part thereof amounting to fifteen hundred dollars, on or before the

9th April, 1845, and one fifth part, being a like sum as the above, on or before the 9th day of April, in each and every year until the whole shall be paid, and shall, on the first day of June, and the first day of December, in the year 1839, and on the first day of June and December, in each and every year thereafter, until the above principal sum shall be fully paid, pay interest at the rate of eight per cent. per annum on whatever portion of the aforesaid principal sum of seven thousand five hundred dollars may be unpaid, so that the said Archibald K. Smith shall always pay the interest on the sum secured and unpaid semi-annually, at the office of the Alabama Life Insurance and Trust Company aforesaid, in the city of Mobile. The same to be paid, both principal and interest, at the current rate of exchange between Mobile and New York, as the same may be due at the several dates at which the aforesaid principal and interest will be due and payable. And if default be made in the payment of the said sums of money, or the interest thereof, or any part thereof, at the times hereinbefore specified for payment thereof, for thirty days, the said Archibald K. Smith, in such case, doth hereby agree that the aforesaid principal sum shall become immediately thereafter due and payable. But if the said interest and instalments be punctually paid, &c. &c.'

The bill alledges that neither the instalments of the debt, or the interest thereon, or either of them, have been paid, whereby the whole bond has become due, &c.

The defendant, by his answer, admits the execution of the bond and mortgage, and that he has not paid but the first instalment of interest and exchange—that although the bond and mortgage express an indebtedness in money, that the consideration of the bond was not a debt or money, but the obligations of the Company to the amount of seven thousand five hundred dollars of the following form:

" The Alabama Life Insurance and Trust Company acknowledge to owe ———, as Secretary of said Company, for value received, five hundred dollars, to be paid to him, or to his order, at ———, in the city of New York, on the —— day of ———, 18—; and the said Company do further engage to pay interest thereon, at the rate of six per cent per annum, semi-annually at ———— aforesaid, to-wit: fifteen hun-

dred dollars on the first days of January and July in each and every year, upon the delivery of coupons, severally hereto annexed, until payment of the said principal sum

JAMES INNERARITY, President.

E. Martineau, Secretary.

That when he executed his bond to the company, he received from them the bonds of the company to the same amount, indorsed by their Secretary, and that it was in fact an exchange of credits, and insists that the company had no power under their charter to issue bonds of this character, and that his obligation to the company, given in exchange for them, is void.

By the testimony of Robert G. Gordon, it is proved that the consideration of the bond of Smith, was as stated in his answer the bonds of the company; that he was not indebted to the company, and received from them no money; that he was present and saw Smith pay one instalment of interest and exchange; that exchange on New York, ever since 1828, has been against Mobile, varying on specie funds from one-half of one per cent. to two and a half per cent.

The Chancellor decreed that the contract was valid, and that if not paid within thirty days, the mortgage be foreclosed, &c.

From this decree the defendant prosecutes this writ of error and assigns for error—1. That the bill should have been dismissed. 2. That the contract was usurious, and the principal sum only should have been recovered without interest.

Dargan, for plaintiff in error, cited Angell and Ames on Cor. 139; 13 Peters, 587; 4 Wheaton, 636; 15 Johns. 44; 4 Randolph, 406; 4 Peters. 205, 224.

R. Saffold and Stewart, contra, cited 2 Cowen. 664; 3 id. 684; 5 id. 590; 7 id. 540; 3 Wendell, 94; 9 id. 384; 15 Johns. 44; 5 Ohio Rep. 205; 7 Mass. 433; 12 S. & R. 306; 1 Ala. Rep. 148; 2 id. 452; Ang and Ames on Cor. 138.

ORMOND, J. This controversy grew out of a contract made by the Alabama Life Insurance and Trust Company with the plaintiff in error. The company advanced to the plaintiff their bonds in amounts of five hundred and a thousand dollars, in all amounting to the sum of seven thousand five

hundred dollars, which were made payable to the Secretary of the Company, or his order, at ——— in the city of New York, carrying interest at the rate of six per cent. per annum, payable semi-annually, on the first day of January and July in each and every year, upon the delivery of *coupons* severally annexed thereto until payment of the principal sum.

In consideration of the receipt of these bonds, the plaintiff executed to the Company his bond in the sum of seven thousand five hundred dollars, with condition to pay that sum in the following manner: One fifth part on the 9th April, 1845, and the remaining four-fifths annually on the 9th April of each succeeding year, until the whole sum was paid. And also agreed, on the first day of June and December, in each and every year thereafter, until the whole principal was paid, to pay interest at the rate of eight per cent. per annum, on whatever portion of the principal sum was unpaid, at the office of the Company in Mobile; both principal and interest to be paid at the current rate of exchange between Mobile and New York. Upon default of payment of either of the instalments, or interest, for thirty days, the whole principal sum to become due and payable.

To secure the performance of this contract, a mortgage was given on real estate, and default being made this bill is filed to foreclose the mortgage.

The counsel for the plaintiff in error contend, first, that this contract was usurious—secondly, that it was a sale of the credit of the Company, and being unauthorized by the charter, is void. We will examine the last point first.

It is too well settled to be now controverted that a corporation created by statute can do those acts and exercise those powers only which are conferred on it by its charter, or which are necessary to enable it to perform its functions, and fulfil the purpose of its creation—or which flow by necessary implication from some power granted. [Dartmouth College v. Woodward, 4 Wheaton, 518; Head v. The Providence Insurance Company, 2 Cranch, 127; Beatty v. Knowler, 4 Peters, 152; New York Fire Insurance Co. v. Sturges, 2 Cowen, 664; The State v. Stebbins, 1 Stew. 299.] To the act of incorporation we must therefore look for authority to make the contract here sought to be enforced.

71

The second section of the charter thus defines the powers of the Company :

" The said Company shall have power—1. To make insurance on lives, and also against losses by fire, and to take marine risks. 2. To grant and purchase annuities. 3. To make any other contracts involving the interest or use of money and the duration of life. 4. To receive monies in trust and to accumulate the same at such rate of interest as may be obtained or agreed on, or to allow such interest thereon as may be agreed on. 5. To accept and execute all such trusts of every description as may be committed to them, by any person or persons whatsoever, or may be transferred to them by any Court of record whatever. 6. To receive and hold lands under grants, with such general or special trusts or covenants, so far as the same may be taken in payment of their debts, or as security for loans of their capital, or otherwise, or purchased upon sales made under any law of this State, so far as the same may be necessary to protect the rights of said Company, and the same again to sell, convey and dispose of."

The seventh section declares—" That the capital stock of the said corporation shall be one million of dollars, which shall be divided into shares of one hundred dollars each. The whole of said capital stock shall be invested in bonds or notes, drawing interest, not exceeding seven per cent. per annum, secured by unincumbered real estate, in Alabama, of at least double the value in each case, of the sum so secured : *Provided*, That houses and other buildings on town lots mortgaged to said Company, shall be insured against the risk of fire, and the policy of insurance transferred to said corporation."

"Sec. 14. Each subscriber shall, at the time of subscription, pay the sum of two dollars on each share by him subscribed; and after the shares shall have been subscribed, each stockholder shall pay an instalment of twenty-five dollars, on each share so held by him, at the expiration of six months, at such place or places as the trustees shall appoint, of which time and place, or places, at least eight weeks public notice shall be given, and at the expiration of eighteen months after the said stock shall have been subscribed, the whole amount shall be paid, in manner aforesaid, of which the same notice shall be given. The shares of every stockholder omitting to make such

payment shall be forfeited, together with all previous payments made thereon, and the books shall be again opened as directed in the eleventh section, for subscription, and so from time to time till all shares are subscribed and paid for.

"Sec. 18. The trustees shall have discretionary power of investing the premium and profits received by the Company, and the monies received by them in trust, in government or public stock of the United States, or of any State, or in the stock of any incorporated city, or in such real or personal securities as they may deem proper, or loan the same to any county, city, incorporated town or company, at a rate of interest not exceeding the present legal rate.

The act of incorporation was amended in December, 1836, by declaring that so much of the seventh section as requires the whole amount of the capital stock of the said Company to be loaned on notes or bonds, secured by unincumbered real estate, be and the same is hereby altered and amended so as to authorize the said Company to invest and employ one half of the capital stock aforesaid in the same manner that they are authorized by the eighteenth section of the charter, to invest and employ the profits and premiums of said Company, and the monies received of them in trust, and also to take risks against the dangers of inland navigation.

A brief synopsis of this charter, as it affects this case, with its amendment is, that the capital stock of the Company was to be one million of dollars, which was required to be paid in, *in cash*—and such other monies as it might receive in trust. One half of the capital of one million it was required to invest in bonds or notes, at an interest not exceeding seven per cent. secured by unincumbered real estate within the State of Alabama—the remaining half of the capital stock, together with the premiums and profits received by the Company, and the monies received in trust, might, in the discretion of the Company be invested in stocks; loaned to any city, county or company; or be invested in such *real or personal securities* as it might deem proper, at any rate of interest not exceeding the then legal rate.

The consideration of the bond and mortgage, as recited in the bill, is, that the plaintiff in error was indebted to the com-

pany in the sum for which the bond was given. The answer denies any indebtedness and alledges that the consideration of the bond and mortgage, was the bonds of the company for the same amount, falling due subsequently ; and this allegation of the answer is sustained by the proof. The contract then entered into between the parties, was a loan or exchange of the bonds of the company, for the bond and mortgage of the plaintiff in error ; and we now proceed to inquire what provision of the charter authorized the company to make such a contract.

By the second clause of the second section of the charter, the company are authorized "to grant and purchase annuities," and by the third, "to make any other contracts involving the interests or use of money, and the duration of life."

We do not consider it necessary at this time to inquire whether these two clauses have not a necessary connection, and whether the " contracts involving the interests or use of money," which the company are empowered to make, are not connected with *annuities and insurance on lives*, because so far as these clauses can be understood to authorize a loan or investment of the funds of the company, they are illustrated and explained by other portions of the charter, where the power of loan or investment of the capital stock, is applied to the particular cases in which these powers may be exercised ; as in the third, fourth, fifth and sixth, and especially in the seventh and eighteenth sections, and in the amendment to the charter. But if the third clause, before referred to, could be considered, contrary to the whole scope and design of the charter, as a substantive grant of power to the company, to make any contract " involving the interests or use of money," not to be controlled, or regulated, by other parts of the charter clearly hostile to such an interpretation, it would not avail the company to sanction the contract made in this case, unless it can be shown that by the use of the term *money*, the Legislature meant the *promises* of the company to pay money in future, or that *credit* could be considered as synonimous with *cash*.

By the charter, as originally framed, the company were required to invest its entire capital of one million of dollars, in bonds or notes, drawing an interest not exceeding seven per cent. per annum, secured by unincumbered real estate within

the State of Alabama, which was so far modified by the amendment to the charter, as to require but one half of the capital stock to be thus invested. It cannot be pretended, that the investment in this instance was made out of that portion of the capital stock required to be invested by mortgage on land in Alabama, because the obligation of the company to pay money in future, cannot be considered a part of the capital stock which was required to be paid in in cash, and also because this contract is at the rate of *eight* per cent. per annum, whilst these investments were, by the charter, required to be at a rate not exceeding *seven* per cent. per annum.

By the eighteenth section and the amendment to the charter, a discretionary power was given to the company of investing its *premiums and profits, the monies received by it in trust, and one half of its capital stock,* in the public stocks of the United States, or of any State or city, of loaning the same to any county, city, town or company, or investing it in such *real or personal security* as it might deem proper, at any rate of interest not exceeding the then legal rate.

To the power last mentioned, of investing in real or personal securities, this transaction would have to be referred for support, if it was an actual loan of money, as it is the only one which by any reasonable construction could embrace the case; and conceding that construction to be correct, the question now presented is whether the bonds of the company subsequently to fall due, is a part of " one half of the capital stock " of the company—a portion of its " premiums or profits," or whether they can be considered " monies received by it in trust." It would be a most unnecessary act to enter seriously upon this enquiry; as no ingenuity or sophistry could convert the bonds of the company, by which it obliged itself at a future time to pay money, into the actual money capital of the company, so no argument could be a more perfect demonstration than the mere statement of the facts of the case.

Nor can it be pretended that a power to lend or exchange its credit was necessary to enable the company to perform its functions. It was supposed in argument that the company might want funds abroad to meet some of its engagements, as for example to pay a marine risk for which it had become responsible. It cannot be questioned that the Company has pow-

er to do all acts which are necessary to effectuate any power granted to it, and as it might want funds abroad to answer its responsibilities, it would have the right to adopt the usual and customary means for transmitting the money. We cannot however perceive that this admitted principle has any application to this case, as it is inconceivable how the Company could place funds at a distant point, by making an obligation *to pay* money there, and exchanging that obligation for that of a person residing in this State, promising to pay money here at intervals, extending over the space of five years. As it is clear there is no warrant in the charter for this contract expressly given, so it is equally certain that no such authority can be implied from any power granted. It cannot be doubted for a moment, that the Legislature did not intend to permit the Company to lend or deal upon its credit; every provision of the charter forbids such a supposition. If such had been the design, why was the payment of the stock in money secured by stringent provisions? Why those limitations and guards thrown round the application of the capital when paid in? Why was the portion of the capital limited which could be invested in stocks, or real or personal security? Or why indeed, it may be asked, was any sum stated as the capital stock of the Company, when, according to this construction, its only limitation would be the extent of its credit, and its ability to find persons willing to exchange their individual responsibility for its promises to pay in future.

We are, for the reasons given, entirely satisfied that the charter of the Company did not authorize it to make such a contract as this. In the Life and Fire Insurance Company v. The M. F. Ins. Co. [7 Wendell, 31,] it was held that a company authorized to lend money, on *bond and mortgage* could not recover money lent by the corporation unless a bond and and mortgage was taken for its repayment. It was also urged that it does not appear that the bonds of the Company were not to fall due at some short time, if not actually due when the plaintiff in error received them, and might have been preferred by him to the money. The testimony of Mr. Gordon is that the consideration of the bond of Smith was the obligations of the Company, received by him, and that no money passed.

It is not possible to doubt the true nature of the transaction. The bonds of the Company carry on their face the impress of their true character, and the functions they were designed to perform. They are according to the approved modern form, with "*coupons*" annexed—of convenient amounts for sale and negotiation, being in sums of five hundred and a thousand dollars—the payment of the principal postponed to a future period, and the interest payable semi-annually, upon the delivery of "*coupons.*" It does not appear when they were to fall due, but they were evidently not due then, as the interest was to be paid *semi-annually.* So the bond of the plaintiff in error to the Company, was payable by instalments in five years, the interest payable *semi-annually,* and was probably designed to meet the engagement of the Company, the latter being payable in New York, the former in Mobile, a month in advance, with the difference of exchange between the two places; the bonds of the Company bearing interest at the rate of six per cent. and that of the plaintiff in error eight per cent. per annum. These facts, in connection with the testimony of Mr. Gordon, and in the absence of any countervailing proof, are sufficient to establish the fact that the Company was lending, not its capital, but its credit, the inducement being the difference between the interest it was to pay and that it was to receive on the amount lent. It is entirely unimportant what the value of the bonds of the Company was, when the plaintiff in error received them, but it is highly improbable that they were at par with, or convertible into money, but at a discount.

Some reliance was placed in argument on the twenty-sixth section of the charter, which provides, " That this act shall not be construed to confer on the said Company any rights or power to make any contract, or to accept or exercise any trust whatever, which it would not be lawful for any individual, when not restrained by statute, under the general rules of law, to make, accept or execute." This clause was doubtless added, out of abundant caution, and from an apprehension that the language employed might warrant a construction beyond what was intended in the grant of powers to the Company. The Legislature merely intended in this section, to say, and in fact have said, in intelligible language, that the powers ex-

pressly granted to the Company should not be exercised by it if, at the time, the same power could not, by law, be exercised by a natural person. To suppose that it was intended by this clause to enable the Company to make any contract, or to do any act which a natural person could make or do, would have been to abrogate all the previous limitations of the powers of the Company contained in the charter. It is too clear for argument that such is not the fact.

The plain and broad distinction between a natural and an artificial person is, that whilst the former may do any act which he is not prohibited by law from doing, the latter can do none which the charter giving it existence does not expressly, or by fair inference, to enable it to perform its functions authorize it to do; and when it transcends the limits within which it is confined by its charter, its acts are wholly void. Such is the case in this instance. The Company had no power to lend its obligations to pay money in future, the contract therefore made by it with the plaintiff in error, whether it be considered a loan of the bonds of the Company, or an exchange of credits, is void, and the security taken for the performance of this illegal contract, being necessarily void also, cannot be the foundation of any proceeding in a court of justice.

Having attained this conclusion, it is unnecessary to prosecute this inquiry further, to ascertain whether the contract was or was not usurious, as the result of the opinion already expressed is, that the decree of the Chancellor must be reversed, and a decree be here rendered dismissing the bill.