## RICHMOND GUANO CO. v. FARMERS' COTTON SEED OIL MILL & GINNERY CO. et al.

(Circuit Court of Appeals, Fourth Circuit. December 10, 1903.)

No. 487.

1. CORPORATIONS—LIMITATION OF POWERS BY PURPOSE OF INCORPORATION—CONTRACTS ULTRA VIRES.

A corporation organized "to build and operate a cotton seed oil mill, and ginnery in connection therewith, to compress cotton seed oil, to buy cotton seed, to sell their products, to manipulate and compound cotton seed meal, with other substances and elements, so as to make fertilizers to be sold for fertilizing lands, and to gin and compress cotton into bales for the market," has no power to engage in the business of buying and selling a fertilizer made by another, and which is sold in the same condition as when bought, and notes given by it for the purchase price of such fertilizer to be so sold are ultra vires and void.

2. SAME—LIABILITY FOR PROPERTY SECURED THROUGH ULTRA VIRES CONTRACT.

A corporation which has secured property by means of a contract which was beyond its corporate powers to make, but which was entered into by both parties in good faith, and has sold or used such property, is liable for its value notwithstanding the fact that the contract was ultra vires, and it is equally liable if the ultra vires contract was one of agency under which it obtained the property and converted it to its own use.

3. SAME.

Defendant corporation, which was created for manufacturing and selling cotton products, including fertilizers, and compressing cotton, entered into a contract with complainant by which it agreed to receive and sell "as agent" fertilizers manufactured by complainant, settlement therefor at the invoice price to be made on a certain date by payment in cash for all that had been sold for cash and by the execution of its notes for the

---

¶ 2. See Corporations, vol. 12, Cent. Dig. § 1557.

remainder, notes to be taken from all time purchasers and turned over to complainant as collateral security for its own notes. The contract provided that, until sold, the fertilizers were to remain the property of complainant. Settlement was made by note, as provided in the contract. *Held* that, conceding the contract to be ultra vires and that the notes were void, and whether it be considered one of agency or sale, defendant was liable for the value of the fertilizers received and sold by it thereunder and not paid for.

Keller, District Judge, dissenting on the ground that the contract was one of agency, by which, in effect, defendant became guarantor of the notes it took from purchasers, and that such guaranty was ultra vires and not enforceable, it not appearing that defendant had failed to turn over all cash and notes received by it from purchasers.

Appeal from the Circuit Court of the United States for the District of South Carolina.

In Equity.

For opinion below, see 119 Fed. 709.

Julius H. Heyward (Heyward, Dean & Earle, on brief), for appellant.

H. J. Haynesworth (L. O. Patterson, on brief), for appellees.

Before MORRIS, WADDILL, and KELLER, District Judges.

MORRIS, District Judge. This was a creditors' bill filed by the Richmond Guano Company, a corporation of Virginia, against the Farmers' Cotton Seed Oil Mill & Ginnery Company, a corporation of South Carolina, and the City National Bank of Greenville, S. C. The complainant alleged that it was a creditor of the oil mill company for $18,591.30 upon three promissory notes executed by the oil mill company and given to it for goods furnished. That the oil mill company was also indebted to the City National Bank in the sum of $7,500, which the bank was threatening to put in suit. That there were other claims against the oil mill company amounting to $13,500, on which suits had been entered. That if the suits were allowed to go to judgment the result would be disastrous to other creditors. That the directors were not in accord as to the proper course to pursue, and incapable of rescuing the company from its difficulties. The prayer for relief was that all creditors be required to prove their claims and be enjoined from enforcing their claims otherwise than in this suit, and for the appointment of a receiver to take possession of and sell all the assets, and for other relief. Upon the bill and affidavits the Circuit Court appointed a temporary receiver, and after a hearing appointed a permanent receiver. Afterwards a sale of all the property of the oil mill company, except its choses in action, was decreed, and under it the property was sold and the money brought into court for distribution. The defendant the City National Bank, by answer which it filed, denied the validity of the claim set up by the complainant, upon the ground that it arose from a transaction which the oil mill company had no corporate authority to make and which was ultra vires. The trial judge who heard the case below so decreed, and disallowed the complainant's claim in the distribution among creditors. This disallowance constitutes the first assignment of error in this appeal by the complainant.

In the charter of the Farmers' Cotton Seed Oil Mill & Ginnery Company the general purpose of the corporation and the nature of the business it proposed to do is stated to be "to build and establish a cotton seed oil mill, and ginnery in connection therewith, and to compress cotton seed oil; to buy cotton seed; to sell their products; manipulate and compound cotton seed meal with other substances and elements so as to make fertilizers to be sold for fertilizing lands, and to gin and compress cotton into bales for the market." The transactions with the Richmond Guano Company consisted of contracts signed in December, 1900, and March, 1901, for, in all, 1,500 tons of the Richmond Guano Company's brands of fertilizers, to be delivered to the mill company in car-load lots at Greenville, S. C., or at certain other points, at prices named. It was agreed by these contracts that all fertilizers sold by the oil mill company for cash should be settled for in cash on or before May 1, 1901, and on that day notes for the remainder should be given, payable one half November 1, 1901, and the other half December 1, 1901. It was agreed that all the fertilizers and all the proceeds thereof were to remain the property of the Richmond Guano Company, and be held by the oil mill company in trust for it until settlement in full. It was further agreed that all notes taken from purchasers for credit sales should be made payable not later than October 15, 1901, and should be turned over to the Richmond Guano Company on or about May 1, 1901, as collateral for the payment of the promissory notes given by the oil mill company.

On the evidence in the record it seems to us that no question can be made but that the fertilizers called for by the contracts, and for the purchase price of which promissory notes were given by the oil mill company to the guano company, amounting to $18,591.30, were furnished, and were sold by the oil mill company without manipulation of any kind, and a large percentage never came to the mill, but by the direction of the oil mill company was shipped to other places. So far as the oil mill company is concerned, it is a clear case of dealing in fertilizer manufactured by another, and a distinct business not in any way incidental to the manufacture of a fertilizer by compounding cotton seed meal with other substances. We entirely agree with the learned district judge, who heard the case below, that this was a transaction beyond the scope of the corporate power of the oil mill company, and in no way reasonably necessary or proper in order to enable it to carry on its authorized business. Its business was to establish a cotton seed oil mill and a ginnery, to compress cotton seed oil, to gin and compress cotton into bales, to compound cotton seed meal into fertilizers, to buy cotton seed, and sell its products. None of these purposes require or imply in any way large buying and selling of fertilizers manufactured by others as a business incidental to the authorized purposes of the charter. Safety Insulated Wire & Cable Co. v. Mayor, etc., of Baltimore, 74 Fed. 363, 20 C. C. A. 454, and cases cited in the opinion. The learned trial judge ruled that the contracts between the Richmond Guano Company and the oil mill company were ultra vires and void, and we think he was right.

But we are of the opinion that the claim of the Richmond Guano

Company to recover for the value of the fertilizers shipped by it to the oil mill company, and sold by the oil mill company, does not require that the contract should be enforced as an authorized contract. The contract is not malum in se, or tainted with any fraud. It is an ordinary mercantile contract, which a creditor of the oil mill company contends should be treated as a nullity. If it is annulled, its rescission requires that the oil mill company, upon its disaffirmance, should return the goods received under it. It cannot both disaffirm the contract and keep the goods. Or, if it has put the goods beyond its control, it must answer for their value, not in affirmance of the contract, but in consequence of its disaffirmance. We think this highly equitable principle is well established.

In Brice's Ultra Vires, 649, the general proposition is stated that "a corporation must in every case of an ultra vires engagement, entered into in bona fides, account for any benefit derived from the engagement," and the author comments on that proposition as follows:

"Why should not a corporation be always liable to refund the money or property of a person which it has obtained from transactions beyond its capacity but not otherwise improper, or, if unable to return it in specie, to pay for the benefit that it has obtained thereby? To say that a corporation cannot sue or be sued upon an ultra vires arrangement is one thing; to say that it may retain the proceeds thereof which have come into its possession without making any compensation whatever to the person from whom it had obtained them is something very different, and savors very much of an inducement to fraud."

Slater Woolen Co. v. Lamb, 143 Mass. 420, 9 N. E. 823, is a case, often cited, in which a corporation authorized to manufacture woolen fabrics bought dry goods and groceries to run a general store, and when sued on the contract of sale the defendant corporation pleaded ultra vires. The Supreme Judicial Court of Massachusetts said:

"If it be assumed in favor of the defendant that the contracts of sale in the case at bar were ultra vires of the corporation, they were not contracts which were prohibited, or contracts which were void as against public policy or good morals; the defect in them is that the corporation exceeded its powers in making them. The defendant under the contracts has received the goods, and retained and used them. Either the corporation must lose the value of its property or the defendant must pay for it. In such an alternative courts have held, on one ground or another, that an action can be maintained when the sole defect is a want of authority on the part of the corporation to make the contract. We think the corporation can maintain an action of contract against the defendant to recover the value of the goods. The defendant is not permitted to set up this want of authority as a defense; and, as the form of the transaction was that of contract, such should be the form of the action. We are not required to determine whether an action can be maintained to recover the price, as distinguished from the value of the goods, as no exception has been taken to the measure of damages."

The same general principle is stated in 5 Thompson on Corporations, §§ 6015–6018. Also in 27 Am. & Eng. Ency. of Law (1st Ed.) 366–371. Also in Main v. Casserly, 67 Cal. 127, 7 Pac. 426, and in Memphis, etc., R. R. v. Dow (C. C.) 19 Fed. 388–393.

In Logan County Bank v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107, county bonds had been placed with a national bank under an agreement, which it was afterwards held the bank had no

power to make, but by which it agreed to return the bonds to the plaintiff upon being tendered back the price which the bank paid the plaintiff for them. The plaintiff, under the terms of the contract, demanded their return, and the bank refused, and the plaintiff brought suit. The Supreme Court held that if the bank was without corporate power to purchase the bonds under such an agreement, and repudiated it as a contract it had no authority to make, then it had no right to retain the bonds, and, upon being repaid the money it had paid out, should return them, and upon refusal became liable for the value of the bonds upon grounds apart from the contract under which it obtained them. The Supreme Court held that even though the bank had no authority to purchase the bonds, yet it was not exempt from liability to the plaintiff for the difference between the price it paid for them and their value at the time it refused to return them. In the opinion delivered by Mr. Justice Harlan many cases are cited, and this quotation is given from Marsh v. Fulton County, 10 Wall. 676–684, 19 L. Ed. 1040:

"The obligation to do justice rests upon all persons, natural and artificial, and, if a county obtains the money or property of others without authority, the law, independently of any statute, will compel restitution or compensation."

The same rule is also asserted in Spring Co. v. Knowlton, 103 U. S. 49, 26 L. Ed. 347.

In Pullman's Car Co. v. Transportation Co., 171 U. S. 138–150, 18 Sup. Ct. 808, 43 L. Ed. 108, the same rule was applied to a contract which was not merely beyond the power of the defendant corporation to make, but was also void as against public policy, unless by law expressly permitted. The facts were that sleeping cars and their equipments had been put into the possession of the Pullman Car Company under a lease for 99 years, which, after 15 years' operation and acquiescence by both parties, was declared ultra vires and void. The court held that the property originally transferred under the terms of the void lease must be returned, but, as it had been mingled with the lessee's property and practically had disappeared, its value must be paid to the lessor. The court said, "The right to a recovery of the property transferred under an illegal contract is founded upon the implied promise to return or make compensation for it." The court, on page 151, 171 U. S., and page 813, 18 Sup. Ct., 43 L. Ed. 108, gives a reference to a number of cases applying the principle to different facts.

There is a well-recognized distinction between executory and executed contracts in respect to the doctrine of ultra vires. Courts will not only refuse to compel execution of such contracts, but will interfere to restrain performance when their jurisdiction is properly invoked; but, when one party has received the consideration of such a contract and then disaffirms it, he cannot in good conscience be permitted to retain what he has unlawfully obtained. We know of no good reason why this principle should not be applied to the present case. If the transaction is to be regarded as one in which the oil mill company was made the agent of the guano company to sell the goods shipped to it, all the more is it bound to return either the stipulated

proceeds or the goods. It is obvious, however, that the contract partook more of the nature of a sale than of an agency. The oil mill company agreed to give its promissory notes for the purchase price, or for that part which remained unpaid at the date when the notes were to be given, and, as collateral security for the payment of its notes, it agreed to turn over the notes taken by it from its vendees until its obligations to the Richmond Guano Company were settled in full.

In Ex parte White, In re Nevill, L. R. 6 Ch. 397, and 24 L. T. 45, it was said by Mellish, L. J.:

"If the consignee be at liberty, according to the contract between him and his consignor, to sell at any price he likes, but is to be bound if he sells the goods to pay to the consignor for them at a fixed price and at a fixed time, in my opinion, whatever the parties may think, their relation is not that of principal and agent. The contract of sale which the alleged agent makes with his purchaser is not a contract made on account of his principal, for he is to pay a price which may be different, and at a time which may be different, from that fixed by the contract. He is not guarantying the performance by the persons to whom he sells of their contract with him, which is the proper business of a del credere agent, but he is to undertake to pay a certain fixed price for the goods, at a certain fixed time, to his principal, wholly independent of what the contract may be with the persons to whom he sells, and my opinion is that, in point of law, the alleged agent in such case is making on his own account a contract of purchase with his alleged principal, and is again reselling."

In Gibney v. Curtis, 61 Md. 192–198, these views of Lord Justice Mellish were adopted as sound, and were applied.

It does not appear that any of the fertilizers were ever tendered back, and it is to be presumed that the oil mill received the benefit of them. So much as appears in the record tends to show that they were sold. The secretary and treasurer of the oil mill company states that, so far as he remembers, they were sold in the original packages, or repacked and sold, and there is no testimony that any of the fertilizers remained unsold. It therefore seems that it is immaterial whether the oil mill company obtained the fertilizers as purchaser or as agent, for it is still true that it has converted the goods to its own use, and has not paid so much of the agreed price as is represented by its promissory notes, except so much as has been realized out of the collateral notes.

It does not seem to us that the giving of the collateral notes as security changes the nature of the transaction. The transaction was made by the president of the oil mill company in good faith, and, so far as appears, at the fair wholesale price for the fertilizer contracted for, with the expectation of a profit for his company. The secretary and treasurer of the oil mill company testified that in his opinion the handling of the purchased fertilizer helped the sale of their own products to the farmers. The transaction, for all that appears, was made in good faith, and for profit and incidental advantages to the oil mill company. There is no evidence that it was not profitable to the oil mill company. The objection to the claim of the guano company is not made by the oil mill company nor by any stockholder, but by a creditor whose dividend may have been increased by the transaction with the guano company. The goods cannot now be returned, and, as

there is nothing to show that their value is different from the selling price, we can see no reason why the value of the goods, for the purposes of the oil mill company's implied liability, should be assumed to be different from the contract price.

We think that the claim of the Richmond Guano Company, after the deduction of all proper credits derived from all sources, should be allowed. That the balance of the fee to the complainant's solicitor, to the amount which in the record he stated he was willing to accept, should be allowed. That the commission to an attorney for collection, stipulated in the notes given to the guano company, be not allowed. The costs of this appeal to be paid out of the funds.

The decree is reversed, with directions to proceed in accordance with this opinion. Reversed.

KELLER, District Judge (dissenting). I am reluctantly forced to dissent from the opinion in this case. My views in regard to the question` of ultra vires presented by the record herein are well set forth by the opinion of the learned judge below. My views are also in harmony with those of the judge below as regards the true character of the contracts made between the Richmond Guano Company and the oil mill company. He says in his opinion:

"It is impossible to call these contracts sales of goods. They expressly stipulate that all the fertilizers ordered and the proceeds thereof are the property of the Richmond Guano Company. The contracts are really an agreement by the Farmers' Cotton Seed Oil & Ginnery Company to receive fertilizers from the Richmond Guano Company, sell them for its account, binding itself for the invoice price of shipments, and looking for its compensation to the sums over and above the invoice prices which it could obtain."

The agreement referred to is as follows:

"Richmond Guano Co., Richmond, Va., Mar. 4, 1901.

"To Farmers' Cotton Seed Oil Mill and Ginnery Co., Greenville, S. C.: We will furnish you this season, delivered in carload lots, free on board cars or boat at Greenville, S. C.:

|  | | Cash. | Time. |
|---|---|---|---|
| | Gilt-Edge Fertilizer,<br>Special Premium Brand for<br>Tobacco,<br>Premium Brand for Tobacco, | at $21.55 per ton, | at $22.30 per ton. |
| 500<br>Tons. | Premium Brand Fertilizer,<br>Bone-Mixture,<br>Alkaline Bone or Potash Mixture,<br>High-Grade Acid Phosphate,<br>Dissolved S. C. Phosphate,<br>Old Homestead Dissolved Bone, | $18.25 " "<br>at $17.55 " " | at $19.00 " "<br>at $18.30 " " |

and as much more as may be mutually satisfactory, to be sold by you as our agents, on the following terms and conditions:

"All fertilizers ordered by you and sold for cash to be settled for in cash on or before the 1st day of May, 1901, and your notes for the remainder to be given us on or before the 1st day of May, 1901, payable one-half November 1st, 1901, and the remaining one-half December 1st, 1901, at the City National Bank of Greenville, S. C., and you agree that all of said fertilizers, ordered by you, and all proceeds therefrom, are our property, and shall be held in trust by you, for our account, till your obligations, as above described, are settled in full; and it is further understood and agreed that the fertilizers named are furnished with the guarantee of analysis printed on the sack, but with no guarantee of results from its use, and you are to receive and properly protect them from weather, fire, etc., free of any expense to us.

"For all time sales of said fertilizers, you also agree to take from the purchaser or purchasers bonds or notes, payable not later than 15th day of October, 1901, and to turn over to us on or before the 1st day of May, 1901, said bonds or notes for the gross amount of your time sales as collateral security for the payment of your notes given, as above provided for, and for the payment of any renewal or renewals of said notes, either in whole or in part, you to give us a receipt for the said bonds or notes when they are returned for collection.

"Any fertilizers shipped you during this season, and not named in this agreement, shall be subject to all the terms and conditions of this agreement, and any change of prices made on any of the fertilizers shall not affect the terms and conditions of this agreement, but be subject to same. Any shortage or damage in a shipment to be immediately reported. The destruction of our works, or any part of same, by fire, flood or other cause, gives us the right to cancel the whole or any part of this agreement. When the above named goods are ordered in less than carload lots, there will be an additional charge of $1.00 per ton.

"No verbal agreement or understanding will in any manner affect the conditions and terms of this agreement.

"This proposal is made subject to the approval of the home office after acceptance by you.

"On goods shipped to Woods Crossing, Mauldin, Gantt, Piedmont and Croswell, 25c. per ton to be added, and on shipments to Simpsonville and Pelzer, 35c. per ton to be added to above prices.           Richmond Guano Co.,
"Per C. H. Bulmer.

"Richmond Guano Company, Gentlemen—Your offer is hereby accepted upon the terms and conditions above stated in this agreement.
"J. W. Griffin, Pres.

"Signed in Duplicate.
"March 4, 1901."

The opinion of a majority of the court seems to recognize that these agreements were ultra vires, and, as executory agreements, could not be enforced, but that, having received the goods, the Farmers' Cotton Seed Oil Mill & Ginnery is bound to return them or pay for them. While I fully and completely subscribe to this general doctrine, I cannot assent to the implications of the opinion in this regard. It is evident from the contract above copied that the property in the fertilizers furnished by the Richmond Guano Company thereunder never passed thereby to the Farmers' Cotton Seed Oil Mill & Ginnery. That company was permitted to sell the fertilizers, but so long as they remained in its hands they were, by the very terms of the contract, the property of the guano company. The title never vested for a single instant in the oil mill. The contract expressly stipulates for the sale of these goods, for the turning over to it of proceeds for cash sales, of the notes taken for time sales, and for a receipt to be given for such notes when returned to the oil mill for collection. There is no allegation in the bill nor elsewhere in the record that the oil mill ever failed to turn over any of the proceeds of cash sales, or any notes taken for time sales. If any fertilizers remained unsold at the date of the filing of the bill, they were, under the contract, the property of the guano company, and could have been recovered by it if desired.

It appears that the invoice price of the fertilizers shipped to the oil mill under the contracts was (so far as the record shows) $18,591.30, none of which was due when the bill was filed, and that the complainant at the time held in its hands farmers' notes for fertilizers

sold by the oil mill, amounting to $18,838.68, not a word or syllable of which appears anywhere in the bill filed. On the contrary, any one reading the bill would think that these notes were for goods sold and delivered, and that complainant held no sort of indemnity. Had this been a sale of guano to the oil mill I admit beyond question that if the contract, although ultra vires under the charter of the defendant company, had been executed by the delivery of the goods by the guano company, the defense of ultra vires could not, under the weight of authority, have been pleaded in a suit to recover the price. But this was not the case. The notes given by the oil mill were manifestly given as security for the faithful accounting for the proceeds of sales of fertilizers to the extent of the invoice price, and guaranties of the solvency of the persons to whom it sold the fertilizers. What else can any one make out of the contract exhibited? If the property in the fertilizers never passed to the oil mill, as is stated in the contract, then, manifestly, when the fertilizers were sold it was by virtue of such a relation between the guano company and the oil and ginnery company as was created by the contract, namely, that of an agent, who assumed to guaranty not only its own faithfulness, but the solvency and responsibility of those to whom it sold. Here we are again met with the question whether the oil mill was not acting ultra vires in assuming to do so, and whether it can be held as guarantor of the farmers' notes taken for guano. I have no doubt that the company could not so be bound, and, without going into any discussion of the principles involved, will cite the following authorities in support of my view: Crewer, etc., Mining Co. v. Willyams, 14 Wkly. Rep. 1003; Lucas v. White Line Transfer Co., 70 Iowa, 541, 30 N. W. 771, 59 Am. Rep. 449; Thompson on Corporations, § 5721, and cases there cited. See, also, Johnson v. Chaplin, Montreal L. Rep. 6 Q. B. 111; Smith v. Alabama Life Ins., etc., Co., 4 Ala. 558. In this latter case it was held that, where an insurance and trust company was required by its charter to invest one-half of its capital in bonds or notes secured by mortgage on land within the state of Alabama, and was authorized to invest the remainder in stocks, or loaned on personal security, etc., it could not loan its credit, and that bonds given by it in exchange for the note of an individual for the same amount were void. In discussing this principle in his work on Corporations, Mr. Thompson says:

"If the doctrine that the capital of a corporation is a trust fund for the security of its creditors is any more than an empty and idle collection of words, then the principle is also designed for the security of the creditors of the corporation, by preserving from an unauthorized dissipation a fund which, in the event of insolvency, equity impresses with a trust in their favor. It is of great importance to consider whether the principle has been designed as a protection to the stockholders merely, or the creditors as well; because, if it is designed as a protection to the stockholders merely, it is plainly competent for them to waive the privilege, and by unanimous consent, either in the form of a precedent authorization or of a subsequent ratification, to validate the act of embarking the funds of the corporation in an undertaking by which it becomes a guarantor or surety for the payment of the debt of another. If the principle is designed for the protection of the stockholders only, then no question of public policy is involved in it, any more than in the question whether a partner can charge the assets of the firm by an accommo-

dation indorsement for a third person. If, on the other hand, the rights of the creditors are involved, then, clearly, it rises to the grade of a question of public policy, because the creditors are not in a position to know what particular contracts or undertakings have been made by the officers of the corporation in its behalf. They have no right to inspect its books; and in most cases particular inquiry by them would be deemed impertinent."

This I conceive to be the true principle applicable to this case, for it matters not how the actors in this contract may have regarded it, the effect of the contract was to make the oil mill company (the agent of the guano company) the guarantor of the farmers' notes taken for guano sold. The majority of the court predicates its opinion largely upon the idea that the oil mill company, having received the goods, and not being in a position to return them, was bound to pay for them. This would be good law if the premises were conceded, but, as I have tried to show, the premises are false. The oil mill company did everything that the agency contract called for; accounted for all cash received, turned over all notes received from farmers, and kept back nothing to itself. Indeed, it could not, as all guano, etc., belonged to the guano company. The oil mill company has made everything good to the guano company except its guaranty, and as to this a creditor says: "The company is insolvent; its debts cannot be paid in full, and that guaranty contract is ultra vires and void." Could it be shown in this case that any proceeds whatever, growing out of this contract of agency (for I feel obliged to call it what the parties did), had come into the hands of the receiver, I should say that as to such fund the guano company was entitled to preference, but nothing of that kind is shown here.

As to the question whether the 10 per cent. attorney's fee, provided in certain of the notes allowed by the court below, can be charged against the fund, my view is that the proper method of computation is to add the 10 per cent. to the amount of the note and interest, and then base the dividend on this amount. I assume this to be the intendment of the court below, and agree with that opinion.

As to the question of allowance to complainant's solicitor, it is evident that, if I am correct in holding that the notes held by the guano company are void, no fee should be allowed.